Maureen WARD, Plaintiff,

v.

Sean HARTE, Defendant.

No. 91 Civ. 7436 (CLB).

United States District Court, S.D. New York.

May 21, 1992.

---

Donald Sapir, White Plains, N.Y., for plaintiff.

George Carpenter, Marshall, Conway & Wright, P.C., New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

Plaintiff in this action to recover damages for housing discrimination based on the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, (the "FHA"), and for claimed violations of 42 U.S.C. §§ 1981 and 1982, moves for partial summary judgment on liability, on the basis of collateral estoppel. Defendant opposes the motion, and the motion was marked fully submitted on April 21, 1992. The decision of the Court is set forth below.

Plaintiff Maureen Ward and her husband Tom Ward are residents of Rockland County, New York. Both Wards are White. The Wards have two natural children, Maureen and Tracy, as well as an adopted child, Andrew, who is Black. On April 15, 1990, plaintiff entered into a residential lease agreement with defendant Sean Harte. The agreement is a standard one-year lease for a house located at 7 Griffith Avenue in Stony Point, New York. Defendant Harte's home is apparently located on the same tract of land as the house rented to the Wards.

On April 3, 1991, the plaintiff filed a housing discrimination complaint against the defendant with the Fair Housing Board of Rockland County, claiming that the defendant had violated the Fair Housing Law of Rockland County. On July 29, 1991, the Board, which consists of five persons appointed by the County Legislature from the membership of the Rockland County Commission on Human Rights, held a hearing on the matter. The defendant was represented by counsel, and Mr. Ward, Mrs. Ward, Mr. Harte and Mrs. Harte all testified at that hearing.

Without restating the entire contents of that administrative hearing, it is clear that some tension developed between these two families during the course of the Wards' tenancy. In plaintiff's view, defendant Harte and his wife discriminated against the Wards based on their son's race. For example, plaintiff claims that on the first day of the Wards' tenancy, Harte came to their home and, on seeing Andrew, stated "I hope you're babysitting this one". Complaint at ¶ 6. Also, plaintiff claims that Harte "denied his children permission to play with Andrew, although he allowed his children to play with plaintiff's Caucasian children". Complaint at ¶ 7. As a result of defendant's racial bias, the plaintiff contends, the defendant refused plaintiff's request of February 15, 1991 to renew the lease, and likewise declined plaintiff's subsequent offer to purchase the property.

Defendant's version of events is rather different. As the defendant testified at the Fair Housing Board hearing in this matter: "Okay. To start off with anyway, insofar as Andy is concerned, we had absolutely no problem with Andy and the renting of the house or selling of the house or anything else. We were very well aware of the fact that Andy existed at the time that we gave them the lease. My problem with the Ward family had nothing to do with Andy period".

"It was to do with how they took care of the property and how they took care of the house. It was in the lease that they would cut the grass, they would maintain the property. It was in the lease that there wouldn't be any cars parked outside the premises. They violated practically everything in the lease. They never raked the leaves, cut the grass. They had a dog on the lawn that was making holes all over the place. Around October, November, they had a car that obviously broke down. Tow truck brought it, dropped it in front of the house, they took the plates off it and left

it sit there until after the time they had moved out. They were moved out at least a week when the tow truck from Keahon, that picks up scrap cars, came and removed the car". Exhibit D to Sapir Affidavit at 51–52.

Defendant also testified about persistent plumbing problems at the Wards' home, as well as the fact that he had previously attempted to rent the house to a Filipino individual whose wife is Asian.[1] As for plaintiff's specific charges, defendant essentially conceded that he made a remark about Andrew, but claims that he was concerned only that "if they intend to adopt him, they could intend to adopt 20 other kids. So I didn't want them to use the house commercially as an adoption center or whatever". Tr. at 61. The defendant also acknowledged that his wife often did not permit his children to play with Andrew, but did so, he states, because "Andy had a habit of throwing rocks". Tr. at 59. Finally, defendant also claimed that he would have permitted the Wards to stay until June, but that the Wards failed to contact him about this option. Tr. at 67.

The Board rendered its opinion and findings on August 21, 1991, and that opinion states in pertinent part:

"The Fair Housing Board concludes that the motivation for refusing to lease and/or sell the house to the Complainant [Mrs. Ward] was a result of his knowledge that the Complainant's son was black".

"On the basis of the evidence, the Board believes that the sole and compelling reason for the failure to renew the lease with the Complainant was because of the racial background of the Complainant's black adopted child". Exhibit E to Sapir Affidavit at 2.

Armed with this finding, the plaintiff filed this suit on November 1, 1991, alleging discrimination in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*

and 42 U.S.C. §§ 1981 and 1982. By motion dated March 23, 1992, she moved for summary judgment on liability, on the theory that the defendant is collaterally estopped by the Fair Housing Board's determination that he discriminated against the plaintiff on the basis of her son's race.

*Legal Analysis*

■ The doctrine of issue preclusion, or collateral estoppel, bars relitigation of issues necessarily decided in prior proceedings. *See generally* Restatement (Second) of Judgments §§ 27, 29 (1982). In this Circuit, the following criteria must be satisfied before issue preclusion applies:

"(1) the issues in both proceedings must be identical, (2) the issue in the prior proceedings must have been actually litigated and decided, (3) there must have been a full and fair opportunity for the litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits". *Beck v. Levering,* 947 F.2d 639, 642 (2d Cir.1991) (*per curiam*) (quoting *Gelb v. Royal Globe Insurance Co.,* 798 F.2d 38, 44 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987)), *cert. denied sub nom. Levy v. Martin,* —— U.S. ——, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992).

Though issue preclusion is most often claimed with respect to prior judicial proceedings, this case concerns the preclusive effect to be given to a prior *nonjudicial* determination. The leading case in this area is *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). In the *Elliott* case, a Black employee of the University of Tennessee's Agricultural Extension Service was discharged, an action which the employee claimed was racially motivated. *Id.* at 790–91, 106 S.Ct. at 3222. The employee requested and was given a hearing, at which an administrative

---

**1.** Although defendant did testify on this point at the hearing, there was at that time no documentary confirmation of his claim. This Court, however, does have an affidavit from Mr. Domingo Botardo, Jr., the individual referred to, which avers "I state unequivocally that at no time during my dealings with Mr. Harte did I feel discriminated against on the basis of my color or race". Exhibit 6 to Carpenter Affidavit at ¶ 6. Mr. Botardo describes himself as "a dark skinned Filipino". Exhibit 6 to Carpenter Affidavit at ¶ 3.

assistant to the University's Vice–President for Agriculture presided as an Administrative Law Judge. *Id.* The ALJ found in essence that the discharge had not been racially motivated, but that the penalty was overly harsh, and ordered the employee transferred to a new assignment. *Id.* This finding was appealed to, and affirmed by, the University's Vice–President for Agriculture. The employee then sought to prosecute his suit against the University for federal civil rights violations.

Confronted with these facts, the Supreme Court chose to articulate a broad rule of law:

> "Accordingly, we hold that when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts." *Elliott, supra,* 478 U.S. at 799, 106 S.Ct. at 3226 (quoting *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)).

Although the Court held that the ALJ's determination did not preclude plaintiff's Title VII claim, due to Congress' intent to provide Title VII plaintiffs a trial *de novo* in federal court, *id.* 478 U.S. at 796, 106 S.Ct. at 3225, the Court did hold that his § 1981 claim could be barred by the prior administrative determination. *Id.* at 799, 106 S.Ct. at 3226.

■ The Supreme Court has also held recently, on the authority of *Elliott,* that judicially unreviewed state administrative determinations likewise do not preclude a subsequent suit under the Age Discrimination in Employment Act. *Astoria Federal Savings and Loan Association v. Solimino,* — U.S. ——, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). While there is no statutory or decisional difficulty with preclusion on plaintiff's § 1981 and § 1982 claims, *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 116 n. 9 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987), the question remains whether the Fair Housing Act claim should be treated like claims under the Reconstruction Civil Rights statutes, and so remain amenable to common-law issue preclusion, or like Title VII and ADEA claims, where preclusion is considered inappropriate, in light of Congressional intent.

The Court has been unable to locate any controlling authority directly addressing this point, although at least one Court of Appeals recognized the issue without deciding it. *Layne v. Campbell County Dep't of Social Services,* 939 F.2d 217, 219 n. 7 (4th Cir.1991). *See also Bradley v. Carydale Enterprises,* 710 F.Supp. 1063 (E.D.Va.1989) (declining to grant preclusive effect to local human rights commission finding in subsequent housing discrimination suit but not reaching statutory issue).

This Court concludes that claims under the FHA may be precluded in an appropriate case, for three reasons. First, the enforcement structure of the Fair Housing Act is significantly different from that of either Title VII or the ADEA: a plaintiff need not pursue any administrative remedies at all before filing a suit under the FHA, 42 U.S.C. § 3613(a)(1) (West Supp. 1992). *See Solimino v. Astoria Federal Savings and Loan Association,* 901 F.2d 1148, 1150–51 (2d Cir.1990) (reasoning from structure of ADEA that preclusion inappropriate), *aff'd,* — U.S. ——, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). Second, the administrative enforcement mechanism which does exist expressly contemplates that the Secretary of Housing and Urban Development defer to the dispute resolution procedures employed by state or local authorities, so long as those authorities meet certain conditions. 42 U.S.C. § 3610(f) (West Supp.1992). Third, Congress, in the 1988 amendments to the FHA, specifically provided that with respect to one type of claim—non-compliance with the statutory mandate to make premises more accessible to handicapped persons—determinations of state and local bodies are *not* conclusive. 42 U.S.C. § 3604(f)(6)(B) (West Supp.1992). Applying the maxim *expressio unius est exclusio alterius,* and since these amendments were enacted after *Elliott,* this subsection lends support to the view that Congress did not intend to deny preclusion to

other determinations of state and local bodies in appropriate circumstances. *See generally* William N. Eskridge, Jr. & Philip P. Frickey, *Cases and Materials on Legislation: Statutes and the Creation of Public Policy* 689 (1988).

Since *Elliott,* federal courts in this Circuit have frequently given preclusive effect [2] to prior determinations of administrative agencies. *Compare DeCintio, supra,* at 118 (plaintiff collaterally estopped by State Division of Human Rights finding of no probable cause from relitigating propriety of discharge under 42 U.S.C. § 1981) and *Kirkland v. City of Peekskill,* 828 F.2d 104, 107 (2d Cir.) (State Division of Human Rights finding given *res judicata* effect), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) *with Hill v. Coca–Cola Bottling Co. of New York,* 786 F.2d 550 (2d Cir.1986) (judicially affirmed administrative denial of unemployment benefits did not collaterally estop plaintiff from litigating § 1981 claim) and *St. Bartholomew's Church v. City of New York,* 728 F.Supp. 958, 965–66 n. 15 (S.D.N.Y.1989) (denying preclusive effect to ruling of New York City Landmarks Preservation Commission), *aff'd,* 914 F.2d 348 (2d Cir.1990), *cert. denied sub nom. Committee to Oppose Sale of St. Bartholomew's Church, Inc. v. Rector,* —— U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 214 (1991). The analysis applied in these cases, following *Elliott,* is whether New York state courts would give the administrative finding preclusive effect, and it is to that analysis that we now turn.

It should first be noted, though, that this case arises in a different posture from all of the cases cited above, for two reasons. First, unlike the great majority of post-*Elliott* decisions, in this case it is the *plaintiff* who is seeking to use the prior determination as a basis for *offensive* issue preclusion. Second, the body for whose determination preclusion is sought is not a state administrative agency, such as the State Division of Human Rights or the

Public Service Commission, *see infra.* Rather, the Rockland County Fair Housing Board is a body created by a County whose members are appointed by the County Legislature. The significance of these points will be discussed *seriatim.*

### Administrative Collateral Estoppel in New York

The New York Court of Appeals has held that:

"the doctrines of *res judicata* and collateral estoppel are applicable to give conclusive effect to the quasi-judicial determinations of administrative agencies ... when rendered pursuant to the adjudicatory authority of an agency to decide cases brought before its tribunals employing procedures substantially similar to those used in a court of law". *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 499, 467 N.E.2d 487, 489–90, 478 N.Y.S.2d 823, 825–26 (1984) (citations omitted).

In such a case, "... the burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in a [sic] prior action or proceeding." *Ryan,* 478 N.Y.S.2d at 827, 467 N.E.2d at 491.

In three significant post-*Ryan* cases, the New York Court of Appeals has established the contours of administrative collateral estoppel. In *Staatsburg Water Co. v. Staatsburg Fire Department,* 72 N.Y.2d 147, 527 N.E.2d 754, 531 N.Y.S.2d 876 (1988), the court declined to give preclusive effect to a state Public Service Commission finding that the plaintiff Water utility had provided adequate service to the defendant Fire Department. 531 N.Y.S.2d at 877, 527 N.E.2d at 755. Its reason for doing so was that:

"... the PSC's determination suffers from a number of defects which, in com-

---

**2.** As Judge Lasker of this Court has noted, *Elliott* itself is somewhat unclear as to which branch of the law of preclusion—*res judicata* or collateral estoppel—it was applying. *Kirkland v. City of Peekskill,* 651 F.Supp. 1225, 1229 n. 1

(S.D.N.Y.), *aff'd,* 828 F.2d 104 (2d Cir.1987). Of course, this Court is only considering the collateral estoppel effect of the prior administrative adjudication.

bination, deprive it of preclusive effect. These defects all spring from the fact that the PSC's finding was, in essence, an unsolicited advisory opinion made outside the context of any complaint pending before the agency and without any direct consequence for the defendant." 531 N.Y.S.2d at 879, 527 N.E.2d at 757.

However, in *Staatsburg*'s companion case, *Allied Chemical v. Niagara Mohawk Power Corporation*, 72 N.Y.2d 271, 528 N.E.2d 153, 532 N.Y.S.2d 230 (1988), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989), the court held that a Public Service Commission determination that the defendant had fully paid for the electricity which it had purchased from plaintiff precluded the plaintiff from relitigating that issue. 532 N.Y.S.2d at 231, 528 N.E.2d at 154. The court contrasted the case with *Staatsburg*, noting that "the parties voluntarily went to the PSC in order to obtain a dispositive ruling in this matter, that is what they received from the PSC, and that is the effect that the determination will be given by the court in this separate action". 532 N.Y.S.2d at 234, 528 N.E.2d at 157.

■ Lastly, in *Halyalkar v. Board of Regents*, 72 N.Y.2d 261, 527 N.E.2d 1222, 532 N.Y.S.2d 85 (1988), the Court of Appeals declined to permit the Board of Regents to base a finding of professional misconduct on a prior admission of guilt entered before the New Jersey Board of Medical Examiners. 532 N.Y.S.2d at 86, 527 N.E.2d at 1223. The court reasoned that the pertinent issue had not been "actually litigated" in New Jersey, 532 N.Y.S.2d at 89, 527 N.E.2d at 1226, and also observed that the offensive use of collateral estoppel by a nonparty to the prior proceeding "may, in some situations, raise legitimate concerns about the fairness of its application". 532 N.Y.S.2d at 90, 527 N.E.2d at 1227. *See also Stevenson v. Goomar*, 148 A.D.2d 217, 544 N.Y.S.2d 690

(3d Dep't 1989) (plaintiff in medical malpractice action not permitted to use offensively prior administrative finding of professional misconduct). These cases establish, then, that before an administrative finding may be given collateral estoppel effect, it must be shown 1) that the agency possesses adjudicatory authority and 2) that the agency's procedures were substantially similar to those used in a court of law. If these prerequisites are met, so that the court is satisfied that an agency's determination would generally be entitled to preclusive effect, then a court must consider whether the individual elements— identity, decisiveness, etc.—have been satisfied.

■ As to the first issue, it is clear that the legislation establishing the Fair Housing Board grants that body authority to act in an adjudicative capacity. Section 261–6(C) of the Rockland County Fair Housing Law grants the Board the authority "to pass upon the validity of complaints alleging violation of this chapter"; subsection (D) likewise empowers the Board:

> "[t]o hold hearings, subpoena witnesses and compel their attendance, administer oaths, take the testimony of any person under oath and, in connection therewith, to require the production for examination of any books or papers relating to any matter under investigation or in question before the Board."

The Board also has authority to render cease and desist orders and to adjudge compliance with such orders. Rockland County Fair Housing Law § 261–6(E). Clearly, then, in light of these powers, as well as the procedural safeguards afforded respondents, Rockland County Fair Housing Law § 261–7(C), the mere fact that the Board is a body created by the County Legislature, rather than a state administrative agency, should not necessarily defeat preclusion.[3]

---

3. Defendant has not challenged the power of a County in New York State to establish such a Board to deal with an issue which would seem to be a matter of statewide concern rather than a proper subject for local authorities. *See* N.Y.Mun.Home Rule L. Article 2,

§ 10(1)(ii)(a)(12) (McKinney Supp.1992) (granting local government authority to adopt local laws to protect "health and well-being of persons or property therein" so long as not inconsistent with state law).

■ The second element of the test—whether the Board employs procedures substantially similar to those used in a court of law—presents a closer question. Clearly, the rules of evidence were not applicable at this hearing, and, as one member of the Board remarked, "we don't go through the strict orders of testimony". Tr. at 28. Furthermore, the record does disclose that some members of the Board were concerned, improperly, with the fact that Mrs. Ward was not represented by counsel, while Mr. Harte was; possibly as a result of this, the cross-examination of Mr. and Mrs. Ward by Mr. Fitzgerald, Mr. Harte's attorney, was limited at certain points.

In addition, Mr. Fitzgerald, in an affidavit submitted in this action, contends generally that the Board had prejudged the issue, notes that the Board excluded the testimony of two witnesses for Mr. Harte and avers further that "there were several times during the proceedings that the court reporter was instructed via hand signal from Commissioner, Alma Roman, to cease transcribing the record". Fitzgerald Affidavit at ¶ 11.

These are serious allegations. However, Harte made no attempt to correct this bureaucratic misconduct, if such it was, by Article 78 review or otherwise. Having carefully reviewed the record, the Court believes on balance that the fact-finding procedures employed by the Board were sufficient to permit a fair airing of the issue. Both Mr. and Mrs. Ward and Mr. and Mrs. Harte testified under oath at the proceeding, which lasted roughly two hours. Mr. Fitzgerald had an opportunity to question each witness, and brought out numerous facts supporting Mr. Harte's version of events. Furthermore, the Members of the Board themselves questioned each of these individuals, which contributed further to a full and open airing of all relevant issues. As the current Restatement of Judgments instructs us:

"The comparison of procedures should focus on the practical aspects of the procedures involved and not simply on matters of form. For example, proof-taking in an administrative or arbitration tribunal may be relatively informal but may nevertheless permit the parties to present substantially the same evidence that might be adduced through the more formal procedures characteristic of courts". Restatement (Second) of Judgements at 285 (1982).

That the Board was biased or prejudged the case, a common complaint of losers, cannot be supported by the record. Accordingly, the Court holds that a New York court would, in appropriate circumstances, grant preclusive effect to a determination of the Fair Housing Board. It now remains to analyze whether the doctrine applies on the particular facts of this case.

■ The first requirement for application of collateral estoppel is that the issues in the two proceedings be "identical". The Fair Housing Act makes it illegal "to refuse to sell or to rent after making a *bona fide* offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin". 42 U.S.C. § 3604(a) (West 1977). The Fair Housing Board determined squarely that the defendant had committed just such an act of impermissible discrimination: it concluded that "... the sole and compelling reason for the failure to renew the lease with [Mrs. Ward] was because of the racial background of [Mrs. Ward's] adopted black child". Ex. E to Sapir Affidavit at 2.

As to plaintiff's second claim, 42 U.S.C. § 1981 (West 1975) forbids discrimination in the making and enforcement of contracts. *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–77, 109 S.Ct. 2363, 2372–73, 105 L.Ed.2d 132 (1989) ("The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms"). Likewise, 42 U.S.C. § 1982 (West 1977), which forms the basis of plaintiff's third claim, prohibits discrimination in transactions relating to real property. These statutes also require proof of discriminatory intent. *General Building Contractors Association, Inc. v.*

*Pennsylvania,* 458 U.S. 375, 388, 102 S.Ct. 3141, 3148–49, 73 L.Ed.2d 835 (1982). Again, the issue litigated before the Fair Housing Board is the exact issue raised by plaintiff's claims under these statutes, e.g., whether Mr. Harte discriminated against Mrs. Ward on the basis of her son's race. Accordingly, plaintiff has demonstrated that the issue determined in the prior proceeding is identical to the issue in this lawsuit.

■ Plaintiff has also satisfied the second element required for application of collateral estoppel, i.e. that the issue was actually litigated and decided in the prior proceeding. As noted above, the Fair Housing Board's hearing was devoted entirely to the issue of whether the defendant discriminated against the plaintiff, that issue was contested vigorously and plaintiff prevailed.

■ The third element of the test—whether the defendant had a full and fair opportunity to litigate the issue in the prior proceeding—presents a more difficult issue. Defendant, citing the exclusion of witnesses, the limitations on his counsel's cross-examination of the Wards and the alleged bias of the panel, contends that he was not afforded such an opportunity. However, the Court, after thorough analysis of the Fair Housing Board's hearing, must disagree. The defendant was represented by counsel at the hearing, testified on his own behalf, cross-examined by his counsel both Mr. and Mrs. Ward, and introduced items into evidence. Thus, despite any procedural irregularities which may have occurred, the defendant's side of the story—that he declined to renew the lease because the Wards breached some of their obligations as tenants—was fully aired at the hearing.

Though the Board lacks authority to grant monetary damages, there is little question that the defendant had every incentive to contest these charges before the Fair Housing Board. *Cf. Staatsburg, supra,* 531 N.Y.S.2d at 879, 527 N.E.2d at 757 ("lack of any direct stake in proceeding" was relevant factor in determining whether party had full and fair opportunity to litigate issue). The hearing raised the possibility that the defendant would be the subject of a public finding that he engaged in racial discrimination. That the defendant himself appreciated the seriousness of such a finding is demonstrated by the fact that he retained counsel prior to the hearing.

Lastly, as plaintiff notes, it would be anomalous to find that this defendant lacked a full and fair opportunity to litigate the issue when higher federal courts have granted preclusive effect to administrative fact-finding procedures that were, in fact, less thorough than those employed here. For example, in *DeCintio, supra,* at 117–118, the court held that an administrative finding of "no probable cause" by the State Division of Human Rights precluded a plaintiff from relitigating his § 1981 and § 1983 claims in a subsequent federal action. *See also Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 483–85, 102 S.Ct. 1883, 1898–99, 72 L.Ed.2d 262 (1982) (same). Although the State Division of Human Rights review procedure does provide that a complainant must have an opportunity to present his charges, at least informally, before a "no probable cause" finding is issued, *id.,* the fact is that the plaintiff in *Kremer* had not done so. *Kremer, supra,* at 485, 102 S.Ct. at 1899. Furthermore, in *DeCintio,* the Court of Appeals implied that it would have granted collateral estoppel effect to a hearing held pursuant to Section 75 of the New York Civil Service Law—even though the plaintiff's participation at the hearing was minimal. *DeCintio, supra* at 116. The relevant legal issue is the fairness of the *opportunity* to litigate. As a practical matter, though, it would be strange indeed for a court to grant collateral estoppel effect to a proceeding where no meaningful hearing was held, as in *Kremer,* yet deny preclusive effect when the prior proceeding included a full hearing on the merits at which the defendant was represented by counsel. Since the defendant had a full and fair opportunity to litigate the issue of whether he discriminated against the Wards, and since that litigation resulted in a valid determination on the merits, the defendant

ordinarily would be collaterally estopped from relitigating this issue.

However, the Supreme Court has recognized that the use of collateral estoppel "offensively" by a plaintiff may implicate fairness concerns not present when the doctrine is used as an affirmative defense, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–331, 99 S.Ct. 645, 650–52, 58 L.Ed.2d 552 (1979), and accordingly has granted district courts "broad discretion" to permit or deny its application. *Id.* at 331, 99 S.Ct. at 652. In this case, since the Court has before it the same parties who appeared at the Fair Housing Board, these concerns are somewhat lessened. There is, though, one particular item in the record that troubles the Court; namely, the fact that the person presiding at the hearing may have inadvertently misled the defendant as to the consequences of the Board's decision:

> "Ms. Roman: ... In the event it is not settled at this level, I want you to know that the next procedure would be either conciliation or into Federal Court".

> .    .    .    .    .

> "Ms. Roman: ... Either of you have a right to appeal the decision of the Board into the Federal Court with that decision. Either side". Tr. at 101, 102.

These comments may well have left Mr. Harte with the mistaken impression that he could "appeal" the Board's decision to this Court. However, the remarks were made at the very conclusion of the hearing, so the fact that Mr. Harte may have believed that an appeal to this court was possible thus could not have affected his defense at that proceeding. In any event, competent counsel would have known that such a procedure was impossible. Furthermore, Mr. Harte was represented at all times by counsel, which significantly mitigates, in the Court's view, any possible unfairness towards him. In sum, the Court believes that the use of offensive collateral estoppel would not be unfair in this case. Accordingly, plaintiff's motion for partial summary judgment on liability is granted.

Counsel are to appear for jury selection on May 27, 1991, to try the issue of plaintiff's damages, as well as plaintiff's liability and damages on defendant's counterclaim.

SO ORDERED.