**UNITED STATES of America, Plaintiff,**

v.

**29 CARTONS, MORE OR LESS, OF AN ARTICLE OF FOOD etc., et al., Defendants.**

**Claim of OAKMONT INVESTMENT CO., INC., Claimant.**

Civ. A. No. 88–2238–T.

United States District Court, D. Massachusetts.

June 8, 1992.

Suzanne E. Durrell, Anita Johnson, U.S. Attys. Office, Boston, Mass., Leslie Kux, Food and Drug Admin., Rockville, Md., for plaintiff.

Robert Ullman, Jacob Laufer, and Steven Shapiro, Bass & Ullman, New York City, for defendants and claimant.

## MEMORANDUM

TAURO, Chief Judge.

On October 4, 1988, the United States of America, through the Food and Drug Administration ("FDA"), filed a complaint for forfeiture, seeking to condemn and destroy articles of food alleged to contain unsafe food additives in violation of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"). Claimant Oakmont Investment Co., Inc. ("Oakmont") owns the subject bottles, labeled "Black Currant Oil," which contain encapsulated black currant oil ("BCO"). Squeezed from black currant seeds, BCO is, as the label reads, a dietary supplement that provides polyunsaturated fatty acids.

At trial, the government contended that the BCO in the capsules[1] constitutes a "food additive," because it is a component of the "dietary supplement," which is the "food." Oakmont argued that the BCO in the capsules is not an additive, but the food itself. Because the FDA chose to proceed against the articles on the ground that they allegedly contain an unsafe food additive, BCO, the determination of whether BCO is an additive or a food is dispositive.[2]

### I.

The FDCA defines "food" as

(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

21 U.S.C. § 321(f). A "food additive" is any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food ...), if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures ... to be safe under the conditions of its intended use....

Id. § 321(s).

Trial was bifurcated. First, the FDA had to show that the BCO in the seized capsules is a food additive, i.e., that it was intended to become a component of, or otherwise affect, a food. If the government failed to prove this, then the derivative issue of the general recognition of safety of BCO as an additive would not have to be tried.

---

1. The capsules are manufactured from gelatin and glycerin (or another plasticizer). Joint Statement of Stipulated Facts, Ex. 1 ("Stipulation") ¶ 11.

2. It may be noted, parenthetically, that the FDA does not suggest that BCO adversely affects humans, see Stipulation ¶ 24, so as to subject it to condemnation under the "food" (as opposed to "food additive") provisions of the FDCA.

The FDA offered the testimony of two experts, Dr. Alan Rulis, a director at the FDA, and Dr. Paul M. Kuznesof, a supervisory chemist there. Dr. Rulis testified that § 321(s) expansively defines "food additives" to include "components of food." Tr. 13, 22. Components, in turn, are "ingredients, substances[3] that are co-mingled, that are eaten together, that touch one another, affect one another." Tr. 18. Applying this definition to the BCO in the seized product, Dr. Rulis testified that the BCO is a component of the food that comprises the BCO and the capsule, and that the BCO is, accordingly, an additive. Tr. 23, 70.[4]

Dr. Kuznesof testified that the capsule serves as a vehicle for delivering BCO in a controlled quantity, maintaining the integrity of BCO, and allowing the BCO to be ingested in a form other than as a liquid. Tr. 41–42. He found no difference between the BCO that could be swallowed in liquid form from the BCO swallowed in the capsules. Tr. 45. He stated that the capsules do not alter the characteristics of the BCO. Tr. 49.

Oakmont's expert, Dr. Dennis Jones, a consultant in the area of nutrition, testified that no public health purpose was served by classifying the encapsulated BCO as a food additive, rather than as a food. Tr. 63.[5]

II.

Mindful of the deference owed to an agency's construction of the statute that it administers, see *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), this court nevertheless concludes that the FDA's interpretations of the statutory terms "component" and "food additive" in this proceeding are contrary to the language of the statute.

To begin with, the FDA's equation of "component" and "additive" is incorrect. The statute uses the word "component" in the definitions of both "food additive" and "food." Whether a component of food is a "food" or a "food additive" depends on its use. See 21 U.S.C. § 321(s) (defining "food additive" by "intended use"); *Nutrilab, Inc. v. Schweiker,* 713 F.2d 335, 337 (7th Cir.1983) ("food" is to be defined in terms of its function). A substance intended to be used in a way that affects the characteristics of a food is a food additive. The statute implies this, when it states that a food additive's intended use results in its either becoming a component of food *or otherwise affecting* the characteristics of food. 21 U.S.C. § 321(s) (emphasis supplied). The FDA, in its regulations, itself confirms this. Its interpretation of the phrase, "affecting the characteristics of food," talks of "migration" of a component to the food and "use[ ]" in changing flavor, texture, or other characteristics in the food. 21 C.F.R. § 170.3(e). "Food," on the other hand, whether as a component of food or simply as food in and of itself, is not defined by its effect on any other substance. Rather, it is defined by its "use[ ] for food." 21 U.S.C. § 321(f).[6]

This understanding of the difference between food and food additives avoids the logical and linguistic stretching pursued by the FDA at trial, such as its contention that an almond, by being broken up into pieces, becomes a component of food, and that a food additive does not need to be added to

---

3. Dr. Rulis relied on the definition of "substance" found in 21 C.F.R. § 170.3(g): "The word *substance* in the definition of the term 'food additive' includes a food or food component consisting of one or more ingredients." Tr. 23.

4. Dr. Rulis also testified that the BCO in the capsule is a food. Tr. 14.

5. Oakmont also proffered, without objection, testimony to the effect that it intended to market the BCO as a food. Tr. 65–66.

6. This definition recognizes that a food may also be a food additive. *See National Nutritional Foods Ass'n v. Kennedy,* 572 F.2d 377, 391 (2d Cir.1978). The practical distinction, such as for purposes of seizure under 21 U.S.C. §§ 334 and

**142**

any other food. Tr. 36, 70.[7]

■ The policies embodied in the statute also support this court's interpretation of the difference between foods and additives. The overriding goal of the FDCA is to protect human health. *Nutritional Foods Ass'n*, 572 F.2d at 391 (citation omitted). In so doing, the statute makes a practical distinction between "foods" and "food additives" for purposes of FDA enforcement. The former substances are presumably safe, and the FDA must, in order to deem them adulterated, show that they are injurious to health. *United States v. An Article of Food (FoodScience Laboratories)*, 678 F.2d 735, 739 (7th Cir.1982). Food additives, however, carry the opposite presumption. A proponent must prove that the additives are generally recognized as safe for their intended use. *United States v. An Article of Food (Coco Rico)*, 752 F.2d 11, 15 (1st Cir.1985). The effect of this burden-shifting is that the FDA may "regulate the use of substances *affecting* food without first determining that they are in fact dangerous...." *Natick Paperboard Corp. v. Weinberger*, 525 F.2d 1103, 1106 (1st Cir.1975) (emphasis supplied), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).[8]

The case law also supports a functional distinction between substances which affect foods, and substances which are themselves only foods. *See FoodScience Laboratories*, 678 F.2d at 741 (Cudahy, concurring) (combined active and beneficial ingredients of tablet are additives); *Natick Paperboard*, 525 F.2d at 1106 (substance that migrates from package to food is an addi-

tive); *Traco Labs*, 761 F.Supp. at 74 (substance that is sole ingredient of capsule not an additive); *United States v. Article of Food ... Orotic Acid*, 414 F.Supp. 793 (E.D.Mo.1976) (substance used in processing dietary supplement is an additive), *aff'd*, No. 76–1554 (8th Cir.1977). *Cf. United States v. Ewig Bros. Co., Inc.*, 502 F.2d 715, 722–23 (7th Cir.1974) (Stevens, J.) (DDT present in fish is an additive), *cert. denied*, 420 U.S. 945, 95 S.Ct. 1324, 43 L.Ed.2d 423 (1975).

### III.

■ This court finds that the BCO in the seized BCO capsules is used for food. This court further finds that the BCO was not intended to be used to become a component, or otherwise affect the characteristics, of any food. The court concludes that the BCO in the seized bottles is a food, within the meaning of 21 U.S.C. § 321(f), but not also a food additive, as that substance is defined in § 321(s). The bottles were, therefore, improperly subjected to seizure for allegedly containing an unsafe food additive.[9]

An order will issue.

### ORDER

For the reasons stated in the accompanying Memorandum, the First Amended Complaint is hereby DISMISSED, and the seized bottles of Black Currant Oil are hereby ORDERED released.

---

342, is based on how the food is used in a particular substance.

**7.** *See United States v. Two Plastic Drums (Traco Labs)*, 761 F.Supp. 70, 74 (C.D.Ill.1991) ("Allowing the FDA to call a single ingredient placed into a gelatin capsule a 'food additive' would eliminate any distinction between 'food' and 'food additive'...."). Furthermore, unlike the FDA's proposed definition of components as substances "that are eaten together, that touch one another, ... [or] become associated closely or intimately with one another," Tr. 18, this court's understanding has a basis in the language of the statute.

**8.** In addition, the distinction of foods and food additives "makes sense from the point of view

of informing the consumer" whether she is buying a single food ingredient or a food composed of different active ingredients. *FoodScience Laboratories*, 678 F.2d at 741 (Cudahy, concurring).

**9.** Despite the court's having already scheduled a trial, and indicated its preference to try the case, rather than rule on a motion for summary judgment, the FDA filed such a motion. The FDA continues to maintain its entitlement to judgment, on the ground that no opposition to its motion was filed. *See* Pl.'s Post–Trial Brief at n. 5. Lest any doubt remain as to the viability of that motion, it is hereby declared MOOT.