[No. D019451. Fourth Dist., Div. One. Mar. 21, 1996.]

ELIZABETH DiROSA, Plaintiff and Appellant, v.
SHOWA DENKO K.K. et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*The four introductory paragraphs, the Facts, part A.I of the Discussion, and the Disposition are certified for publication.

### COUNSEL

Linda Zappe Flynn, McCormick & Cannon, Patrick A. McCormick, Jr., and Roy B. Cannon III and for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, F. John Nyhan, Walter R. Allan, Kimberly A. McDonnell, Cleary, Gottlieg, Steen, & Hamilton and Edwin B. Mishkin for Defendants and Appellants.

### OPINION

NARES, J.—Both sides appeal a $1,050,000 judgment in this jury tried products liability action arising from the plaintiff's ingestion over a period of time of capsules of a substance called L-Tryptophan (LT) that was contaminated. Plaintiff developed an illness called eosinophilia myalgia syndrome (EMS), symptoms of which included very severe muscle pain and progressive skin discoloration, change in texture and rash. The jury returned a $1.8 million verdict reduced by a 41.5 percent comparative fault finding. It denied punitive damages.

The appeal of corporate defendants Showa Denko K.K., LT manufacturer (SDK), and Showa Denko America, Inc., LT importer (SDA), asserts that the trial court committed prejudicial error (a) in allowing the jury to determine whether the defendants' sale of LT complied with the federal Food, Drug

and Cosmetic Act (21 U.S.C.A. § 301 et seq.; Act), and (b) in refusing to give their proffered instruction as to DiRosa's constructive notice of the recall of LT by the federal Food and Drug Administration (FDA).

Plaintiff Elizabeth DiRosa contends on appeal (a) the evidence did not support the jury's 41.5 percent comparative fault finding, (b) the presiding judge's refusal to refer the hearing on her new trial motion to the trial judge who retired before the motion was heard, and the denial of the motion, were prejudicial error, (c) a quotient verdict entitles her to a new trial on the comparative fault issue, (d) the trial court's refusal to admit into evidence an expert's supplemental deposition testimony was prejudicial error, (e) admission of newspaper articles and news releases relating to the LT recall was prejudicial error, and (f) admission of the decision in *U.S. v. Two Plastic Drums* (7th Cir. 1993) 984 F.2d 814 was prejudicial error.

Finding no ground for reversal in the contentions of either side, we affirm.

FACTS[1]

### LT Background

LT is one of the amino acids making up the building blocks in protein needed for both the body's structure and function. Tryptophan is an amino acid characterized as essential because the human body must receive it from an external source; the body cannot make it from other substances. LT is obtained from protein in foods and by way of a dietary supplement.

LT plays a key role in the functioning of the human body as a constituent of protein. It is important for production of serotonin, a neurotransmitter in the brain that helps regulate sleep, mood and perception of pain. Before 1989, many Americans supplemented their dietary intake with substances containing LT, other amino acids and other food ingredients. Until November 1989, there were no adverse health effects associated with use of dietary supplements of LT.

### DiRosa's Contraction of EMS

In 1988, DiRosa was a single parent with a night job, and going to school in connection with a teaching career, doing substitute teaching and working on settling a child visitation and support dispute with her former husband.

---

[1]Since DiRosa's brief does not contain more than a very general statement of the facts, we draw upon the appellants' opening brief of SDK and SDA to some extent for the presentation of the facts.

After seeing a television program dealing with using natural substances for healthy living and hearing LT described as a natural relaxer and sleeping aid, DiRosa began taking LT nightly during weekdays. She purchased LT at places such as Vons market, Thrifty Drug Store, Great Earth and Price Club.[2]

In November 1989, DiRosa was still taking LT but not nightly because it was expensive. That month she heard a television news report about the FDA making note that people in New Mexico were getting sick and they all had taken LT. DiRosa's response was to immediately look at her two bottles of LT and check the paper rings on them to see if there was tampering, as with the Tylenol scare. Remnants of the paper ring were still on the bottles, and DiRosa had already taken about half of her 180-caplet supply. She was engaged in race walking and felt fine. She felt her supply was safe.

The week after she heard the television news report about the illness of people who had taken LT in New Mexico, DiRosa went to the Vons market where she regularly shopped and made a point of noting LT was fully stocked. Aside from checking her personal supply for tampering and looking at the fully stocked shelf of LT at Vons market, DiRosa took no other steps to determine whether her LT was the subject of the FDA report she had heard on television.

DiRosa continued taking one or two LT tablets at bedtime once or twice per week. In April 1990, DiRosa began showing symptoms of EMS. In the sun her toes, feet and fingers puffed out and she did not sweat. When she walked, her legs hardened and ached. By October 1990, DiRosa had a skin rash instead of her usual clear skin. The rash began as a red patch that felt like a first-day sunburn with a very stinging feeling. The rash then progressively changed DiRosa's skin color and thickened its texture. DiRosa lost a great amount of hair on her legs, arms, body and head. The rash began below the knees, but by the time of trial had appeared on the rest of her body, including her face, and had caused her legs to be almost completely discolored. DiRosa's skin also developed temporary red spots when the weather turned hot.

It was not disputed DiRosa also suffered from fatigue, occasionally had numbness in her hands and feet, and had muscle pain. Though she was taking a great number of medications, by the time of trial DiRosa periodically had cramps and muscle burning in her feet and legs, numbness and

[2]The Vons Companies, Inc., Thrifty Corporation and The Price Company were named defendants in DiRosa's action. These defendants, as well as P. Leiner Nutritional Products of Delaware, Inc., were granted a judgment of nonsuit and are not involved in the present appeal.

tingling in her jaw, lips, and tongue, and swelling in her hands, legs and feet, her left arm, and her tongue. She also had problems with side effects while taking medications, including prednisone and methotrexate, prescribed for her EMS symptoms. SDK and SDA also did not dispute that DiRosa had EMS.

At the time of trial DiRosa was still engaged in the teaching profession as a credentialed, permanent teacher.

### Defense Evidence

In July 1992, when she saw rheumatologist Dr. Roy Alan Kaplan, DiRosa said she had disregarded warnings she had heard about tryptophan and continued taking it since she did not feel the warnings applied to the product that was still available. She also said she recalled hearing news stories regarding potential toxicity of some batches of tryptophan.

On November 14, 1989, the FDA notified SDK and others the agency had issued a warning to consumers to temporarily discontinue using LT. Having already been notified by SDA of press reports of a potential health problem associated with LT, on the day before the FDA notified it of the warning to consumers, SDK instructed SDA to discontinue all LT sales immediately. By November 20, 1989, SDA had requested its customers to recall all LT products from the market and had notified the FDA of the recall.

Over DiRosa's objection, the trial court admitted evidence of two newspaper articles of November 13 and 15, 1989, entitled *L-Tryptophan suspected in rare blood disease*, and *Food supplement L-Tryptophan linked to blood disorder*. The court also admitted a November 11, 1989, news release regarding LT.[3] In addition, the court admitted a 1993 case of the Seventh Circuit Court of Appeals, *U.S. v. Two Plastic Drums, supra,* 984 F.2d 814, which dealt with whether another substance, encapsulated black currant oil, was a "food additive" or merely a "food" under the Act.[4] In determining that black currant oil was a food, *Two Plastic Drums* cited a 1979 federal district court case reaching the conclusion LT likewise was a food, not a food

[3]While the parties argue as if the articles and the news release were admitted, they do not demonstrate these items were actually received in evidence. On the date the items were marked, the court and counsel postponed a ruling on DiRosa's objection, and we are not shown any place in the record where the ruling was made.

[4]If a substance is a "food additive," it is presumed to be unsafe and the FDA can prevent its sale unless and until the processor shows the substance, when added to food, is generally recognized as safe (GRAS), and until the FDA has promulgated regulations prescribing conditions assuring safe use. (21 U.S.C.A. § 348(a)(2).)

On the other hand, if a substance is a "food," it is presumed safe and the FDA can prevent its sale only if the FDA proves by a preponderance of evidence that it is injurious to health.

additive. (*United States* v. *An Article of Food . . . L-Tryptophan* (U.S. Dist. (D.N.J.), 1979, No. 77-687).)[5]

## DISCUSSION

### A.

*Appeal of SDK and SDA*

### I

██ SDK and SDA contend the trial court committed prejudicial error in allowing the jury to determine whether their sale of LT complied with the act. DiRosa propounded a per se negligence theory under Evidence Code section 669[6] based on the claim SDK and SDA violated the Act. DiRosa's evidence included testimony that LT was a drug which was sold without approval of the FDA, or a food additive that was not GRAS and thus unlawfully sold as a supplement, and that it was adulterated.

██ *Sierra-Bay Fed. Land Bank Assn.* v. *Superior Court* (1991) 227 Cal.App.3d 318, 336 [277 Cal.Rptr. 753] (*Sierra-Bay*) aptly summarizes section 669 and its application as follows: "[A] plaintiff must prove four elements in order to establish negligence per se. Plaintiff must show that (1) defendant violated a statute, ordinance or regulation of a public entity, (2) the violation proximately caused his injury, (3) the injury resulted from an occurrence of the nature which the statute was designed to prevent; (4) he was one of the class of persons for whose protection the statute was adopted.

(21 U.S.C.A. §§ 321(f), 321(f)(1), 342(a)(1); see *U.S.* v. *29 Cartons of \*\*\* an Article of Food* (1st Cir. 1993) 987 F.2d 33, 35.)

[5]As a matter of interest only, we note that after the trial in this case, the United States Congress passed and the President signed into law a bill establishing a new category of substances subject to the Act, that of "dietary supplement," which includes amino acids (under additional specified conditions of use and presentation). A dietary supplement is deemed to be a food. (Pub.L. No. 103-417 (Oct. 25, 1994); see, e.g., 21 U.S.C.A. § 321(ff)).

[6]Evidence Code section 669 states in pertinent part:

"(a) The failure of a person to exercise due care is presumed if:

"(1) He violated a statute, ordinance, or regulation of a public entity;

"(2) The violation proximately caused death or injury to person or property;

"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

"(b) This presumption may be rebutted by proof that:

"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; . . . ."

All statutory references are to the Evidence Code unless otherwise specified.

(*Capolungo* v. *Bondi* (1986) 179 Cal.App.3d 346, 349-350 [224 Cal.Rptr. 326].) 'While the first two elements are normally considered questions for the trier of fact, "[t]*he last two elements are determined by the trial court as a matter of law, since they involve statutory interpretation . . . .*" ' (*Id.* at p. 350.)" (Italics added.)

Conflicting expert and other evidence, as well as argument, were presented to the jury on the question of whether LT was a drug, food additive or food. The trial court instructed on the parties' general theories,[7] and stated, "I will now instruct you on the law under the Food, Drug and Cosmetic Act. . . ." Immediately thereafter, the court instructed on the Act's provisions concerning adulteration, in pertinent part as follows:

"43. The United States Food, Drug and Cosmetic Act, Section 331, provides as follows: . . . [¶] The following [a]cts and the causing thereof are prohibited:

"
. . . . . . . . . . . . . . . . . . . . . . .

---

[7]On the parties' theories, the court instructed, in pertinent part:

"42. Plaintiff claims that the sale by defendants Showa Denko K.K. and Showa Denko America, Inc. of L-Tryptophan in the United States was in violation of the provisions of the Federal Food, Drug and Cosmetic Act, (the Act) governing food additives and drugs, and was therefore negligent.

"Showa Denko's [*sic*] K.K. and Showa Denko America assert that the L-Tryptophan they manufactured and sold for use as a dietary supplement in the United States was a food, not a food additive or a drug, and that their sale of L-Tryptophan was lawful under the Act."

The court also instructed on the following definitions:

"Number 44. The . . . Act [in] section 321 provides as follows:

"Subsection (F). The term 'food' means (1) articles used for food or drink for man or other animals; (2) chewing gum; and, (3) articles used for components of any such article.

"Subsection (G)(1). The term 'drug' means (a) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official national Formulary, or any supplement to any of them; and (b) articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals; and (c) articles other than food intended to affect the structure or any function of the body of man or other animals; and (d) articles intended for use as a component of any article specified in clauses (a), (b) or (c) of this paragraph.

"Subsection (S). The term 'food additive' means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food, including any substance intended for use in producing, manufacturing, packaging, processing, preparing; treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use, if such substance is not generally recognized among experts qualified by scientific training and experience to evaluate its safety as having been adequately shown through scientific procedures, or in the case of substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food, to be safe under the conditions for intended use. . . ."

"(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or disbanded [*sic*].

"(b) The adulteration or misbranding of any food, drug, device or cosmetic in interstate commerce.

"(c) The receipt in interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise. . . ."

"45. The . . . Act [in section] 351 provides as follows:

"A drug or devi[c]e shall be deemed to be adulterated . . . .

"[(a)(2)(B)] if it is a drug and the methods used in or the facilities or controls used for its manufacture or processing, packing or holding do not conform to or are not operated or administered in conformity with . . . current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength and meets the quality and purity characteristics, which it purports or is represented to possess.

"[(b)] Strength, quality or purity differing from official compendium.

". . . If it purports to be as it represented as a drug the name of which is recognized in the official compendium, and its strength differs from or its quality or purity falls below the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium . . . ."

Finally, with respect to negligence per se, the court instructed: "46. *If you find that the defendants* Showa Denko K.K. and Showa Denko America *violated the provision of the . . . Act just presented to you, and* that *such violation was a legal cause of injury to the plaintiff,* you will find that such violation was negligence unless these defendants prove by a preponderance of the evidence that they did what might be reasonably expected of a person of ordinary prudence acting under similar circumstances who desired to comply with the law. In order to sustain such a burden of proof, the defendants must prove by a preponderance of the evidence that they were faced with circumstances which prevented compliance or justified noncompliance with the statute. . . ." (Italics added.)

This instruction comports with the rule set out in the *Sierra-Bay* case, leaving it to the jury to decide the statutory violation and causation issues

after the court had decided the applicability of the last two elements of negligence per se. ■  There is no doubt in this state that a federal statute or regulation may be adopted as a standard of care. (*Sierra-Bay, supra,* 227 Cal.App.3d at p. 332.) More to the point, a federal standard in the Act has been adopted as the standard of care in a negligence action. (See *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 703-704 [60 Cal.Rptr. 398] [dealing with the Act's provisions relating to investigations to determine whether a drug is safe for use].)

SDK and SDA argue, however, that before a federal statute properly can be used as a standard of care, it must be clear, identifiable and relevant to the facts in dispute. They further assert that in this case the jurors "were not called upon simply to make factual determinations, or to apply clearly applicable statutory standards, but, instead, were asked to interpret complex statutory definitions and to make determinations on disputed legal and policy issues concerning how dietary supplements of LT were and should have been regulated under the [Act]." They claim the issue of whether LT is a food, food additive or drug raises complex questions of federal law and policy that should not have been submitted to the jury.

■  Our reading of the jury instructions, containing definitions set out in the Act, is that they present a classic question of fact. There is nothing in the definitions of food, food additive and drug that is beyond the type of complexity jurors are asked to resolve in many types of cases. In addition, the jury was presented with expert testimony to which it could assign appropriate weight before resolving this question of fact. Except to the extent there is federal statutory language to be applied, we find no complex question of federal law or policy is involved in resolving this issue.

In connection with their argument about the complexity of the federal statutory definitions with which the jury was instructed, SDK and SDA cite two relatively recent decisions, *U.S.* v. *29 Cartons of *** an Article of Food, supra,* 987 F.2d 33, and *U.S.* v. *Two Plastic Drums, supra,* 984 F.2d 814. Rather than demonstrating any complexity in the law, these cases show, in the words of the United States Senate Labor and Human Resources Committee report of October 8, 1994 (to accompany S. 784), enacting the dietary supplements amendments to the Act: ". . . FDA has been distorting the law in its actions to try to prevent the marketing of safe dietary supplement substances . . . [¶] . . . FDA asserted that black currant oil (BCO) was a food additive because it was added to gelatin capsules. The Seventh Circuit noted that 'FDA has not shown that BCO is adulterated or unsafe in any way.' The Court described the FDA's effort as an 'Alice in Wonderland'

approach. Further, the decision by the First Circuit described FDA's approach as 'nonsensical.' " (Sen.Rep. No. 103-410, 103d Cong., 2d Sess., p. 35-106 (1994).)

It should be apparent that the foregoing characterization of the FDA's approach by the Senate Committee and the federal courts precludes giving any weight to the argument of SDK and SDA that LT's status under the Act is a subject for resolution by the FDA, not a jury.[8]

To the extent SDK is arguing the classification of LT was required to be made by the court (see *Bammerlin* v. *Navistar Intern. Transp. Corp.* (7th Cir. 1994) 30 F.3d 898, 900), we point out the instructions on the Act apparently relate exclusively to DiRosa's primary theory of liability that the LT was adulterated. The Act's definitions of "food" and "drug" were given in the context of the Act's adulteration instructions. Under the Act's adulteration instructions, adulteration is prohibited whether the substance is a food or a drug. Thus, even if these instructions were erroneously given because the question of "food" or "drug" should have been determined by the court as a matter of law, under general principles of tort law (and the jury was so instructed), there would be products liability for putting in commerce an adulterated item, whether it was a food or a drug, that causes illness when consumed. In addition, under the specific instructions on the Act the jury would have come to the same result on finding there was adulteration (and causation), whether the substance was found to be a food or a drug.

Since there was, in fact, no governing FDA regulation classifying LT one way or the other, and the same result would attend a finding of adulteration whether the substance was a food or a drug, we conclude first, there was no error in giving the instructions under the Act on adulteration of food or drugs and, second, even assuming some error, it could not have prejudiced SDK.

We conclude there is no ground for reversal in the court's use of, and instructions on, the Act for the purpose of DiRosa's per se negligence theory.

II-VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[8]In connection with the argument that the status of LT should be resolved by the FDA, after oral argument we asked the parties to furnish any regulation, ruling or other official written document, adopted by the FDA immediately before the recall in November 1989, classifying LT as a food, food additive or drug. The parties' responses disclose no such regulation, ruling or other document existed at that time with respect to LT as it was produced, marketed and used in this case.

*See footnote, *ante*, page 799.

DISPOSITION

Judgment affirmed.

Kremer, P. J., and Huffman, J., concurred.

A petition for a rehearing was denied April 18, 1996, and the petition of defendants and appellants for review by the Supreme Court was denied July 17, 1996.