**Noel and Caryll KRAMER, Plaintiffs,**

v.

**SHOWA DENKO K.K., Defendant.**

**91 Civ. 0582.**

United States District Court,
S.D. New York.

June 20, 1996.

▆▆▆▆▆▆▆▆▆▆▆▆

---

Kreindler & Kreindler, New York City (Melvin I. Friedman, of counsel), for plaintiffs.

Cleary, Gottlieb, Steen & Hamilton, New York City (David E. Brodsky, Astrid B. Gloade, & Theresa A. Foudy, of counsel), for defendant.

## OPINION & ORDER

EDELSTEIN, District Judge:

Currently pending before this Court are the parties' respective dispositive motions in the instant products-liability litigation. Defendant Showa Denko K.K. ("defendant" or "SDK") moves this Court for partial summary judgment on plaintiffs' claims for punitive damages, lost-income damages, "actionable misrepresentations," and negligence. Plaintiffs Noel and Caryll Kramer ("plaintiffs" or "the Kramers") move this Court to collaterally estop defendant from denying at trial that its product caused plaintiffs' injuries and that its product was defective. This Court denies in part and grants in part defendant's motion for partial summary judgment. This Court also denies in full plaintiffs' motion for collateral estoppel.

## BACKGROUND

This is a products liability action brought pursuant to this Court's diversity jurisdiction under Title 28, United States Code, § 1332. Plaintiffs, New York citizens, allege that Noel Kramer suffered personal injuries from impurities contained in the product L-tryptophan ("LT"), which was manufactured and sold by defendant, a company organized under the laws of Japan. Plaintiffs' Amended Complaint asserts claims of strict liability, negligence, "actionable misrepresentation," breach of warranty, and loss of consortium. (Amended Complaint, *Kramer v. Showa Denko K.K.*, 91 Civ. 0582 ("Amended Complaint"), at 2-4 (Nov. 7, 1995)). Plaintiffs seek compensatory damages, including damages for loss of consortium and lost income, and punitive damages. *Id.* at 2-4.

Defendant disputes plaintiffs' claims and sets forth seven affirmative defenses: (1) plaintiffs' Complaint fails to state a claim upon which relief can be granted; (2) defendant's products conformed to the current state of medical, scientific, and industrial knowledge, art, and practice at the time of the products' manufacture and sale, and thus defendant could not reasonably know that the products might pose a risk of harm in normal foreseeable use; (3) plaintiffs' injuries were proximately caused by either plaintiffs' own fault, or by the negligence, fault, or defective products of persons over whom defendant had no control and for whom defendant is not responsible; (4) plaintiffs' injuries were caused by medical idiosyncrasies peculiar to plaintiffs that were unknown, unknowable, or not reasonably foreseeable to defendant; (5) defendant's product was generally recognized by experts as safe at the time it was manufactured and sold; (6) if plaintiffs' alleged injuries resulted from improper use, assumption of risk, or contributory negligence with respect to any product manufactured by defendant, then plaintiffs may not recover from defendant; and (7) plaintiffs' claim for punitive damages violates defendant's constitutional rights under the Due Process and Equal Protection Clauses of the United States Constitution and the corresponding provisions of the Constitution of the State of New York. (Amended Answer, *Kramer v. Showa Denko K.K.*, No 91 Civ. 0582, ("Amended Answer") at 2-5 (Nov. 16, 1996).)

## DISCUSSION

Pursuant to this Court's Order, the parties respectively filed dispositive motions on May 1, 1996. Defendant moves this Court for partial summary judgment on several of plaintiffs' claims, and plaintiffs move this Court to collaterally estop defendant from raising certain issues at trial. This Court will address the parties' respective motions individually.

### I. Defendant's Motion for Partial Summary Judgment

In the papers submitted to this Court, defendant moves for partial summary judgment on plaintiffs' claims for punitive damages, lost-income damages, "actionable misrepresentation," and negligence. (Memorandum of Law in Support of Defendant Showa Denko K.K.'s Motion for Partial Summary Judgment on Plaintiffs' Claims for Punitive Damages, Lost Income Dam-

ages, "Actionable Misrepresentations" and Negligence, *Kramer v. Showa Denko K.K.,* 91 Civ. 0582 ("Defendant's Memo") at 1 (May 1, 1996).) Because defendant raises each of these claims pursuant to Federal Rule of Procedure 56 ("Rule 56"), this Court will review the legal principles governing Rule 56 motions before examining defendant's individual claims.

## A. Rule 56

■■■ Pursuant to Rule 56, summary judgement is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC.,* 867 F.Supp. 262, 265 (S.D.N.Y.1994), and the party may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988); *see also Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2.

■■■ To defeat a motion for summary judgement, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Resolution Trust Corp. v. Hidden Ponds Phase IV Dev. Assocs.,* 873 F.Supp. 799, 804 (E.D.N.Y.1995). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Scottish Air,* 867 F.Supp. at 266. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). Such an entry of summary judgment is inappropriate, however, "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, ... even if no opposing evidentiary matter is presented." Fed.R.Civ.P. 56(e) advisory committee's notes (1963 amendment).

■■■ The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air,* 867 F.Supp. at 266. To evaluate a fact's materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate the genuineness of a material fact, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted).

## B. Punitive Damages

In their Amended Complaint, plaintiffs seek punitive damages in the amount of $10,-000,000 because "[t]he conduct of defendant was ... willful, wanton, reckless and in total disregard of the public health...." (Amended Complaint at 3.) Defendant disputes this claim, contending that Japanese law does not recognize punitive damages in civil cases, and that relevant choice-of-law rules dictate that Japanese law controls this Court's resolution

of the punitive-damages issue in this case. (Defendant's Memo at 1–2, 20–24.) Alternatively, defendant argues that even if New York law is applicable, plaintiffs cannot meet their burden of proof on this issue, and therefore defendant is entitled to a judgement as a matter of law. *Id.* at 2, 24–27. In response to defendant's argument, plaintiffs counter that "under applicable New York choice of law rules, the law of New York, not Japanese law should govern the issue of punitive damages." (Plaintiffs' Memorandum of Law in Opposition to Defendant Showa Denko K.K.'s Motion for Partial Summary Judgment on Plaintiffs' Claims for Negligence, Punitive Damages, Loss of Income and "Actionable Misrepresentations," *Kramer v. Showa Denko K.K.*, 91 Civ. 0582 ("Plaintiffs' Memo") at 33 (May 22, 1996).) Plaintiffs claim that they have presented sufficient evidence in support of their punitive-damages claim to create a genuine issue of fact requiring resolution at trial. *Id.* at 37.

■■■ Turning first to the parties' choice-of-law dispute, it is black-letter law that a federal district court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991). In New York, courts follow the governmental-interest-analysis approach in deciding choice-of-law issues in tort cases. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 71, 612 N.E.2d 277, 595 N.Y.S.2d 919 (N.Y. 1993); *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 196–98, 480 N.E.2d 679, 682–85, 491 N.Y.S.2d 90, 94–96 (N.Y.1985). "A court following this approach must evaluate the nexus between each jurisdiction and the controversy in light of the policies and purposes to be vindicated by the conflicting laws." *John v. Sotheby's, Inc.*, 858 F.Supp. 1283, 1289 (S.D.N.Y.1994), *aff'd*, 52 F.3d 312 (2d Cir.1995). The court then will apply the law of the jurisdiction that has the greatest interest in, and is most intimately concerned with, the outcome of a given litigation. *Id.*; *Cooney*, 81 N.Y.2d 66, 612 N.E.2d at 280, 595 N.Y.S.2d at 922. "Thus, under New York conflicts principles, controlling effect is accorded to the law of the jurisdiction which

has the greatest concern with, or interest in, the specific issue raised in the litigation." *Sotheby's*, 858 F.Supp. at 1289 (internal quotations omitted); *see Neumeier v. Kuehner*, 31 N.Y.2d 121, 286 N.E.2d 454, 335 N.Y.S.2d 64 (N.Y.1972).

■■■ The New York Court of Appeals frequently has stated the factors that a court must consider when choosing among competing, conflicting legal principles. Primary among these factors is the character of the law at issue. In *Cooney v. Osgood Mach., Inc.*, Chief Judge Kaye explained:

> If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders. But if competing "postevent remedial rules" are at stake other factors are taken into consideration, chiefly the parties' domiciles.

81 N.Y.2d 66, 612 N.E.2d at 280, 595 N.Y.S.2d at 922. Chief Judge Kaye then reviewed the trio of rules that controls a court's resolution of choice-of-law conflicts in New York—the *Neumeier* rules.

■■■ The *Neumeier* rules derive from a 1972 New York Court of Appeals opinion regarding the applicability of a loss-distribution rule that limited an automobile passenger's ability to recover from the driver. *Neumeier*, 31 N.Y.2d at 123–25, 286 N.E.2d 454, 335 N.Y.S.2d 64. In his opinion for the Court, then Chief Judge Fuld authored a set of rules that he "proposed as sound for situations involving guest statutes in conflicts settings," *id.* at 128, 286 N.E.2d 454, 335 N.Y.S.2d 64, but which New York courts subsequently have applied to other loss-allocation conflicts. *Cooney*, 81 N.Y.2d at 72, 612 N.E.2d 277, 595 N.Y.S.2d 919; *Schultz*, 65 N.Y.2d at 199–200, 480 N.E.2d 679, 491 N.Y.S.2d 90; *Jean v. Francois*, —— Misc.2d ——, 642 N.Y.S.2d 780, 782 (N.Y.Sup.Ct. 1996). The *Neumeier* rules are briefly summarized as follows:

> (1) In "false conflict" cases—where both parties to a dispute share a common domicile—the law of that domicile should control. *Cooney*, 81 N.Y.2d at 73, 612 N.E.2d

277, 595 N.Y.S.2d 919; *Neumeier,* 31 N.Y.2d at 128, 286 N.E.2d 454, 335 N.Y.S.2d 64; *Feldman v. Acapulco Princess Hotel,* 137 Misc.2d 878, 884, 520 N.Y.S.2d 477 (N.Y.Sup.Ct.1987).

(2) In "true conflict" or "split domicile" cases—where defendant's domicile and the place of injury are the same—the law of the place of accident should be applied, but where the plaintiff's domicile and the place of injury are the same, the law of the plaintiff's domicile should apply. *Cooney,* 81 N.Y.2d at 73, 612 N.E.2d 277, 595 N.Y.S.2d 919; *Neumeier,* 31 N.Y.2d at 128, 286 N.E.2d 454, 335 N.Y.S.2d 64; *Feldman,* 137 Misc.2d at 884, 520 N.Y.S.2d 477.

(3) In those cases where plaintiff and defendant have different domiciles, the normally applicable rule of decision will be that of the state where the accident occurred, unless "it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing uncertainty for litigants." *Neumeier,* 31 N.Y.2d at 128, 286 N.E.2d 454, 335 N.Y.S.2d 64; *see Cooney,* 81 N.Y.2d at 73, 612 N.E.2d 277, 595 N.Y.S.2d 919; *Feldman,* 137 Misc.2d at 884, 520 N.Y.S.2d 477.

■ Relevant to the instant litigation is the second *Neumeier* rule because plaintiffs are New York domiciliaries and their alleged injuries occurred in New York. It is clear that there is no common domicile among the parties—defendant is a corporation that operates and is located in Japan, and plaintiffs are New York residents. (Amended Complaint at 1); (Amended Answer at 1.) Moreover, the locus of the alleged tort in question is New York. Although defendants maintain that "Japan, as SDK's place of incorporation and principal place of business as well as the location of manufacture and testing of the product at issue," is the situs of defendant's allegedly tortious conduct, (Defendant's Memo at 1–2), New York law on this question is to the contrary. As both the New York Court of Appeals and federal courts in this circuit have held, where "defendant's negligent conduct occurs in one jurisdiction and the plain-

tiff's injuries are suffered in another, the place of the wrong [for choice-of-law purposes] is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz,* 65 N.Y.2d at 195, 480 N.E.2d 679, 491 N.Y.S.2d 90; *see Hunter v. Derby Foods, Inc.,* 110 F.2d 970 (2d Cir. 1940); *In re DES Cases,* 789 F.Supp. 552, 567 (E.D.N.Y.1992) (quoting *Schultz*); *Rubel v. Eli Lilly & Co.,* 681 F.Supp. 151, 153 (S.D.N.Y.1987). Plaintiffs allege, (Plaintiff's Memo at 334, 37), and defendants do not dispute, that Noel Kramer purchased and ingested the LT that allegedly caused plaintiffs' injuries in New York. Consequently, this Court finds that New York is the situs of the last event necessary to make defendant liable for plaintiffs' alleged injuries, and thus, that New York is "the place of the wrong" for purposes of the instant choice-of-law analysis.

■ Because plaintiffs are New York domiciliaries and New York is the place of their alleged injuries, the second *Neumeier* rule requires this Court to apply New York substantive law in the instant case. *Neumeier,* 31 N.Y.2d at 128, 286 N.E.2d 454, 335 N.Y.S.2d 64. Defendant contends that such application offends the public policy of the state of New York and "impair[s] significant interests" of Japan. (Defendant's Memo at 22–24.) Defendant thus appears to suggest that this Court consider the public-policy implications of this Court's to choice-of-law analysis, pursuant to the third *Neumeier* rule. The New York Court of Appeals, however, clearly has instructed that "the public policy exception should be considered only after the court has first determined, under choice of law principles, that the applicable substantive law is not the forum's law." *Cooney,* 81 N.Y.2d at 78, 612 N.E.2d 277, 595 N.Y.S.2d 919; *Schultz,* 65 N.Y.2d at 202, 480 N.E.2d 679, 491 N.Y.S.2d 90. Because this Court already has determined that the applicable substantive law governing the resolution of the plaintiffs' punitive-damages claim is the law of the forum state, *i.e.* New York, defendant's argument is meritless.

■ This Court finds that defendant's alternative summary-judgment argument on the issue of punitive damages also must be

rejected. To reiterate, defendant contends that even if New York law applies in the instant case, defendant is still entitled to judgment as a matter of law because plaintiffs cannot meet the high burden of proof required to succeed on a claim for punitive damages under New York law. (Defendant's Memo at 24–27.) Defendant properly notes that the availability of punitive damages in New York is limited to cases involving conduct that "h[as] a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 203–04, 550 N.E.2d 930, 551 N.Y.S.2d 481 (N.Y.1990) (internal quotations and citations omitted).

██ As this Court previously stated, entry of summary judgment is appropriate only where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To evaluate a fact's materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Under the substantive law governing punitive damages in New York, the character of defendant's conduct is an issue material to the resolution of any punitive damages claim. *American Home Prods.,* 75 N.Y.2d at 203–04, 550 N.E.2d 930, 551 N.Y.S.2d 481.

This Court's review of the parties' respective papers reveals that plaintiffs and defendant advance diametrically opposite claims regarding the character of defendant's conduct in this case. The parties dispute the safety of defendant's manufacturing and testing processes, defendant's compliance with industry standards, and defendant's awareness of the possible defects in, and dangers of, its product. (Defendant's Memo at 27–34); (Plaintiffs' Memo at 37–47.) Each side cites deposition testimony and has submitted documentary exhibits in support of its position. (Defendant's Memo at 27–34); (Plaintiffs' Memo at 37–47.) Consequently, this Court finds that a genuine dispute exists

concerning facts and that are material to plaintiff's punitive damages claim, "requir[ing] a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted). Accordingly, defendant's motion for summary judgment on plaintiffs' punitive damages claim is meritless.

### C. Lost Income Damages

As part of the compensatory relief requested in this case, plaintiffs seek lost-income damages. (Amended Complaint at 2, 4.) They assert that Noel Kramer took LT for insomnia from 1984 or 1985 until November 1989, that he began suffering health problems associated with LT in July 1989, and that he was diagnosed with eosinophilia-myalgia syndrome ("EMS") caused by LT in November 1989. (Plaintiffs' Memo at 17.) They claim that from July 1987 until the summer of 1989, Noel Kramer commenced a "major business project" for a company called Eclipse Laboratories, Inc. ("Eclipse"), and that he obtained financing for this project from Kidder, Peabody & Co. on the condition that he "acted as a director and business consultant to Eclipse in a hands-on manner." *Id.* at 17–18. Plaintiffs assert that for this work, Noel Kramer was to receive thirty percent of Eclipse's private stock, a salary of $150,000 per year for a period of seven years, and the use of a car for the same term. *Id.* at 18.

Because of the EMS-related health problems Noel Kramer suffered, however, he failed to fulfill his responsibilities to Eclipse. *Id.* Plaintiffs maintain that the company subsequently went into bankruptcy as a direct result of this failure. *Id.* They further claim that Noel Kramer "would have earned several million dollars but for his illness. . . ." *Id.* at 55. In addition, plaintiffs contend that although Noel Kramer continues to act as an investment advisor, "his efforts to obtain additional clients has [sic] been adversely affected by his health." *Id.* at 18.

In support of these assertions, plaintiffs have submitted documentation to this Court. Plaintiffs have provided affidavits from Noel Kramer's business associates. (Plaintiffs' Af-

fidavit in Opposition to Defendant Showa Denko K.K.'s Motion for Partial Summary Judgment on Plaintiffs' Claims for Negligence, Punitive Damages, Loss of Income and "Actionable Misrepresentations," Accompanying Exhibits and Plaintiffs' Rule 3(g) Statement, *Kramer v. Showa Denko K.K.*, 91 Civ. 0582 ("Pls.' Ex.") Exs. 4–5 (May 23, 1996).) The affidavit of Herbert Morris ("Morris"), a former director and business consultant of Eclipse, is particularly relevant. (Pls.' Ex. 4.) Morris affirms that Noel Kramer had an agreement with Eclipse to obtain financing and to act as a director and business consultant in return for thirty percent of the firm's private stock, an annual salary of $150,000 for seven years, and the use of a car during that same period. *Id.* at 1–2. Plaintiffs also submit copies of medical records documenting Noel Kramer's EMS diagnosis, (Pls.' Ex. 33), as well as excerpts from his deposition in which he discusses these issues. (Pls.' Ex. 6.)

In its motion for partial summary judgment, defendant advances two arguments in opposition to plaintiffs' claim for lost-income damages. First, defendant argues that "[p]laintiffs cannot sustain a claim for lost wages because Noel Kramer did not earn any wages prior to his alleged injury and could not have lost what he never had." (Defendant's Memo at 35.) SDK asserts that compensatory damages such as lost wages are available only to put a plaintiff in the same economic position that he would have occupied had he not been injured. *Id.* It further claims that when Noel Kramer became ill with EMS in 1989 "he already had been retired for 15 years due to a preexisting medical disability," and that during these fifteen years, "he was not employed and earned no wages." *Id.* at 6. In support of this argument, defendant both cites and submits to this court portions of Noel Kramer's deposition testimony as well as his tax returns. *Id.* at 37. Defendant concludes that because Noel Kramer did not earn any wages for fifteen years prior to contracting EMS, defendant is entitled to summary judgment. *Id.* at 38.

Second, SDK maintains that plaintiffs cannot prove that they are entitled to lost earnings based on Noel Kramer's agreement with Eclipse "because plaintiff cannot present sufficient evidence to establish such earnings with certainty." *Id.* SDK asserts that under New York law, damages for lost profits must be "capable of being proven with 'reasonable certainty." *Id.* According to defendant, Noel Kramer's agreement with Eclipse is "too speculative to be a valid basis for a damages award," *id.* at 39, and that plaintiffs have provided no other evidence that can establish Noel Kramer's economic damages with any degree of certainty. *Id.* at 39–41. In light of plaintiffs' insufficiency of evidence on this claim, defendant argues that it is entitled to judgment as a matter of law. *Id.* at 41.

The law on compensatory damages for economic injury in New York is clear. "The basic rule is that loss of earnings must be established with reasonable certainty, focusing in part on the plaintiff's earning capacity both before and after" his injury. *Clanton v. Agoglitta,* 206 A.D.2d 497, 499, 615 N.Y.S.2d 68 (N.Y.App.Div. 1994); *see Burdick v. Bratt,* 203 A.D.2d 950, 951, 612 N.Y.S.2d 993 (N.Y.App.Div.1994); *Kirschhoffer v. Van Dyke,* 173 A.D.2d 7, 9–10, 577 N.Y.S.2d 512 (N.Y.App.Div.1991); *Johnston v. Colvin,* 145 A.D.2d 846, 535 N.Y.S.2d 833 (N.Y.App.Div.1988); *Kaylor v. Amerada Hess Corp.,* 141 A.D.2d 331, 332, 528 N.Y.S.2d 845 (N.Y.App.Div.1988). Such claims may not be based on pure speculation and conjecture. *Bailey v. Jamaica Buses Co., Inc.,* 210 A.D.2d 192, 192, 620 N.Y.S.2d 257 (N.Y.App.Div.1994). "Recovery for lost earning capacity is not limited to a plaintiff's actual earnings before the accident, however, and the assessment of damages may instead be based upon future probabilities." *Kirschhoffer,* 173 A.D.2d at 10, 577 N.Y.S.2d 512; *Grayson v. Irvmar Realty Corp.,* 7 A.D.2d 436, 439, 184 N.Y.S.2d 33 (N.Y.App.Div. 1959). Under New York law, "[w]hat is the appropriate amount to be awarded for loss of earnings is normally a jury question." *Loudermilk v. Allstate Ins. Co.,* 178 A.D.2d 897, 898, 577 N.Y.S.2d 935 (N.Y.App.Div. 1991).

This Court's review of the record in this case reveals material issues regarding

Noel Kramer's lost salary and lost use of a vehicle in his planned position with Eclipse. Although defendant has demonstrated that Noel Kramer's past earning history is unimpressive, plaintiffs' exhibits support their claim regarding Noel Kramer's future salary and use of a vehicle with Eclipse. Plaintiffs' exhibits provide definite terms regarding Kramer's future annual salary from Eclipse. If a jury finds this evidence credible, the jury could calculate Noel Kramer's lost future salary and the value of the use of the vehicle with "reasonable certainty." Under New York law, evidence of such future probable earnings is sufficient to create a material issue of fact regarding Noel Kramer's lost salary and use of a vehicle. *See Kirschhoffer*, 173 A.D.2d at 9–10, 577 N.Y.S.2d 512. Because the parties' respective exhibits thus create material issues of fact regarding Noel Kramer's lost salary and the value of the use of the vehicle, this Court finds that defendant's motion for summary judgment on this issue should be denied.

■ This Court finds, however, that defendant is entitled to summary judgment on plaintiffs' claim that plaintiffs are entitled to lost-income damages for the thirty percent of Eclipse's private stock that Noel Kramer was to receive under his contract with Eclipse. Plaintiff is unable to establish the value of this lost stock with any "reasonable certainty," as is required by New York State law. *See Clanton*, 206 A.D.2d at 499, 615 N.Y.S.2d 68.

Although plaintiffs assert that Noel Kramer worked for Eclipse from July 1987 until the summer of 1989, they concede that "Eclipse went into bankruptcy in early 1990." (Plaintiffs' Memo at 18 (internal quotation omitted).) Nevertheless, plaintiffs state that "Herbert Morris, an Eclipse director, valued the stock plaintiff was to receive at $10 million." *Id.* Neither plaintiffs' memorandum of law nor Morris's affidavit explains how the $10,000,000 figure was calculated.

Plaintiffs have merely speculated about alleged profits that Noel Kramer would have reaped from his ownership of thirty percent of Eclipse's private stock. Plaintiffs' claim of damages assumes that if Eclipse had received the financing that Noel Kramer

sought to obtain for the company, then: (1) Eclipse would have avoided bankruptcy; (2) Eclipse would have operated as a profitable business; and (3) Noel Kramer's thirty percent of Eclipse stock would have increased in value. Moreover, plaintiffs entirely fail to explain: (1) how many shares of stock Noel Kramer was to receive; (2) what the price of these shares would have been; (3) how Eclipse's stock would have performed if Eclipse had not gone into bankruptcy; (4) when and at what price, Noel Kramer would have sold his Eclipse stock, thus realizing his $10,000,000; (5) to whom Kramer would have sold his Eclipse stock; or (6) how plaintiffs can ascribe any market price to "private stock" that presumably is not traded on any stock exchange. In light of the highly speculative nature of plaintiffs' claimed damages for the lost value of the Eclipse stock, plaintiffs cannot establish these damages with any reasonable certainty. *See Bailey*, 210 A.D.2d at 192, 620 N.Y.S.2d 257. Accordingly, defendant is entitled to a judgment as a matter of law.

■ Plaintiffs also seek to recover lost-income damages on the ground that Noel Kramer has lost business as an investment advisor because of his injuries. Plaintiffs claim that Noel Kramer "acted and still acts as an investment advisor" but that his "efforts to obtain additional clients has [sic] been adversely affect by his health." (Plaintiffs' Memo at 18.) Defendant counters that plaintiffs have failed to identify any of Noel Kramer's clients and failed to show that any of these clients' accounts grew in size. (Reply Memorandum of Law in Further Support of Defendant Showa Denko K.K.'s Motion for Partial Summary Judgment on Plaintiffs' Claims for Punitive Damages, Lost Income Damages, "Actionable Misrepresentations" and Negligence, *Kramer v. Showa Denko K.K.*, 91 Civ. 0582 ("Defendant's Reply Memo") at 33 (June 5, 1996).) Moreover, defendant argues that "it is undisputed" that plaintiffs have never derived any income from Noel Kramer's work as an investment advisor. *Id.*

■ Because plaintiffs have failed to provide the Court with evidence to substantiate

their claim of damages for the income that Noel Kramer allegedly would have earned as an investment advisor, defendant is entitled to a judgment as a matter of law. As previously discussed, a party seeking summary judgment may meet its burden under Rule 56 by demonstrating that there is an absence of evidence to support the non-moving party's case on an issue that the non-moving party would bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. In the instant case, plaintiffs bear the burden at trial of proving with "reasonable certainty" the amount of lost-income damages that plaintiffs suffered as a result of Noel Kramer's loss of business as an investment advisor. Plaintiffs have failed to produce evidence that could establish with reasonable certainty what damages, if any, they suffered as a result of Noel Kramer's inability to conduct his investment-advice business. Plaintiffs have not provided the Court with any evidence about the size, scope, or operation of Noel Kramer's business. Plaintiffs merely bring an unsupported allegation that Noel Kramer would have made money as an investment advisor if he had not contracted EMS. Because conclusory statements, speculation, and conjecture are no substitute for evidence, *see Bailey*, 210 A.D.2d at 192, 620 N.Y.S.2d 257, the instant claim does not survive defendant's motion for summary judgment.

### D. Actionable Misrepresentations

 The third cause of action listed in plaintiffs' Amended Complaint is "actionable misrepresentation." (Amended Complaint at 3.) Defendant argues that an action for fraudulent misrepresentation under New York law requires a plaintiff to prove by clear and convincing evidence: (1) misrepresentation, concealment, or nondisclosure of a material fact; (2) intent to deceive on the part of the defendant; (3) justifiable reliance upon the misrepresentation by the plaintiff; and (4) injury to the plaintiff as a result of such reliance. (Defendant's Memo at 41.) According to defendant, plaintiffs have not presented, and discovery has not revealed, proof of any of these four elements. *Id.* at 42.

Defendant correctly explains the four elements that must be established by clear and convincing evidence in order to sustain an action for fraudulent misrepresentation in New York. *Idrees v. American Univ. of the Caribbean*, 546 F.Supp. 1342, 1346 (S.D.N.Y. 1982); *Cullen v. BMW of North America, Inc.*, 490 F.Supp. 249, 254 (E.D.N.Y.1980); *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406–07, 151 N.E.2d 833, 176 N.Y.S.2d 259 (N.Y.1958). Defendant also correctly asserts that the record in this case contains evidence of none of these elements. Although plaintiffs included the words "actionable misrepresentation" in the title of their memorandum in opposition to the instant motion, plaintiffs fail to mention this issue anywhere in the body of this fifty-seven page document. Similarly, this Court's examination of plaintiffs' exhibits reveals no evidence that establishes any element of this tort. Moreover, in his affidavit, plaintiff Noel Kramer concedes that the source upon which he relied for information regarding the characteristics or benefits of LT was his own psychiatrist, not defendant. (Defendant's Exhibits in Opposition to Defendant Showa Denko K.K.'s Motion for Partial Summary Judgment on Plaintiffs' Claims for Negligence, Punitive Damages, Loss of Income and "Actionable Misrepresentations," *Kramer v. Showa Denko K.K.*, 91 Civ. 0582, Ex. 3 (May 1, 1996).)

As previously stated, in order to defeat a motion for summary judgement, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *RTC v. Hidden Ponds*, 873 F.Supp. at 804. Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Scottish Air*, 867 F.Supp. at 266. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). In the instant case, plaintiffs have not responded to defendant's motion for summary judgment on the issue of misrepresentation, and the record in this case is completely devoid of evidence supporting plaintiffs' misrepresentation

claim. Accordingly, defendant's unopposed motion for summary judgment on plaintiff's misrepresentation claim should be granted.

### E. Negligence

■■ Plaintiffs claim that defendant was negligent in the testing, manufacturing, labeling, promoting, distributing, and selling of LT. (Amended Complaint at 2.) Plaintiffs further assert that defendant negligently failed to issue warnings or to recall plaintiffs' LT after defendant received notice of illnesses occurring in users of LT. *Id.*

Defendant argues that plaintiffs have failed to prove the requisite elements of the tort of negligence. SDK explains that establishing a causal link between defendant's allegedly negligent conduct and plaintiffs' injury is a necessary element of a negligence cause of action. (Defendant's Memo at 8.) According to SDK, plaintiffs have both failed to meet their burden of proving that defendant's conduct caused plaintiffs' injury, and plaintiffs wrongly have suggested to this Court that negligence causation can be established merely by linking defendant's product to plaintiffs' injury. (Defendant's Reply Memo at 24); (Defendant's Memo at 7–8.)

Plaintiffs counter that there are, in fact, triable issues, with regard to both SDK's negligence and causation in this case. (Plaintiffs' Memo at 33.) Plaintiffs maintain that SDK owed plaintiffs a duty to test and inspect its LT, to possess the skill and knowledge of an expert in the field, and to comply with industry and governmental standards required of manufacturers of substances such as LT, and that SDK breached each of these duties. *Id.* at 21–29.

On the issue of causation, plaintiffs submit reports and affidavits from various experts that support plaintiffs' claim that defendant's breach of duty caused plaintiffs' injuries. For instance, in an affidavit, plaintiffs' expert Dr. Kenneth Bolvin Taylor ("Taylor") states that "[s]pecific contaminants have been identified and characterized in the [LT] from Showa Denko that are not present in the same product from other manufacturers." (Pls.' Ex. 17, at 2.) Taylor continues that he believes that "the presence of these contaminants was caused by the fact that [SDK] failed to comply with adequate safety standards for the manufacture of this product," *id.*, that SDK was aware that their LT contained levels of contaminants greater than those generally deemed safe and acceptable, *id.* at 3, and that "but for the negligence on the part of [SDK] to follow minimum standards required of manufacturers of genetically engineered L-tryptophan, the EMS epidemic, and the plaintiffs' attendant injury, would not have occurred." *Id.* A report regarding the subject matter, facts, and opinions that Dr. Stanley J. Cristol will testify about at trial also contains information regarding the presence of impurities in SDK's LT, the nature of these impurities, SDK's failure adequately to test its LT, and the causal relationship among these facts and EMS. (Pls.' Ex. 40.) The affidavit of Dr. Pamela Simms similarly supports plaintiffs' theory that SDK's negligent LT manufacturing and testing processes resulted in the presence of contaminants in SDK's LT that cause EMS. (Pls.' Ex. 10.)

Citing such exhibits, plaintiffs assert that "[p]hysicians and scientists are virtually unanimous in concluding that the EMS epidemic was caused only by SDK's LT." *Id.* at 31. Plaintiffs continue that "[h]aving proved that SDK's LT caused plaintiff's injuries and the EMS epidemic, it is not also necessary under New York law to prove the scientific defect or contaminant in SDK's LT that causes EMS," because such a defect can be inferred from expert testimony as well as from circumstantial evidence. *Id.* at 31–32. Accordingly, plaintiffs claim that they can satisfy each element of a negligence cause of action, including the element of causation. Consequently, plaintiffs claim that they are entitled to proceed to trial on the issue of negligence. *Id.* at 31, 33.

■■ To establish a case of negligence under New York law, a plaintiff must prove several " 'distinct elements: negligence (duty and a breach thereof), causation (cause in fact as well as proximate cause) and damages.' " *Doolittle v. Ruffo*, 882 F.Supp. 1247, 1259 (N.D.N.Y.1994) (quoting *Wolfe v. Samaritan Hosp.*, 104 A.D.2d 143, 146, 484 N.Y.S.2d 168 (N.Y.App.Div.1984)). Case law

does not require that plaintiff offer direct evidence in support of each of these elements. On the contrary, "[i]t is enough that [plaintiff] shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred." *Schneider v. Kings Highway Hosp. Ctr., Inc.*, 67 N.Y.2d 743, 744, 490 N.E.2d 1221, 500 N.Y.S.2d 95 (N.Y.1986); *Kadyszewski v. Ellis Hosp. Assn.*, 192 A.D.2d 765, 766, 595 N.Y.S.2d 841 (N.Y.App.Div.1993); *Brito v. Manhattan & Bronx Surface Transit Operating Auth.*, 188 A.D.2d 253, 254, 590 N.Y.S.2d 450 (N.Y.App.Div.1992), *app. diss.*, 81 N.Y.2d 993, 616 N.E.2d 153, 599 N.Y.S.2d 798 (N.Y.1993); *Hunter v. Ford Motor Co.*, 37 A.D.2d 335, 337, 325 N.Y.S.2d 469 (N.Y.App.Div.1971). "Further, in determining whether plaintiffs have established a prima facie case, the evidence must be viewed in the light most favorable to the plaintiffs, and every favorable inference which can reasonably be drawn therefrom must be afforded them." *Brito*, 188 A.D.2d at 253, 590 N.Y.S.2d 450; *Candelier v. City of New York*, 129 A.D.2d 145, 146, 517 N.Y.S.2d 486 (N.Y.App.Div.1987). "As long as the record yields a view of evidence upon which a jury could rationally find for the plaintiff, he is entitled to have the jury pass upon the case, and the complaint may not be dismissed." *Candelier*, 129 A.D.2d at 146, 517 N.Y.S.2d 486.

In the instant case, this Court finds that plaintiffs' exhibits provide sufficient evidence of each of the elements of the negligence tort to create a genuine issue of fact for the trier of fact at trial. The acts or omissions of which plaintiffs accuse defendants constitute a cognizable negligence claim under New York law. For instance, there is no doubt that manufacturers owe a basic duty to inspect and test their products to ensure that their products are reasonably safe for consumption. *Smith v. Peerless Glass Co.*, 259 N.Y. 292, 296, 181 N.E. 576 (N.Y.1932); *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (N.Y.1916). It is similarly clear that "[u]nder general tort rules, a person may be negligent because he or she fails to warn another of known dangers or, in some case, of those dangers which

he had reason to know." *Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 246, 451 N.E.2d 195, 464 N.Y.S.2d 437 (N.Y.1983). Case law similarly supports plaintiffs' claim that failure to comply with regulatory standards can provide evidence of negligence. *Barker v. Kallash*, 63 N.Y.2d 19, 24, 468 N.E.2d 39, 479 N.Y.S.2d 201 (N.Y.1984).

In addition, the evidence that plaintiffs have submitted to this Court regarding the issue of causation satisfies the legal standard for this element. As New York law requires, this Court accepts as true the expert testimony and information contained in the voluminous exhibits that plaintiffs submitted to this Court regarding the issue of causation. Accepting plaintiffs' exhibits as true, this Court finds that they provide sufficient circumstantial evidence of causation between defendant's allegedly negligent actions and plaintiffs' injury to establish a prime facie case of negligence. Because the record in this case "yields a view of evidence upon which a jury could rationally find for the plaintiff," plaintiffs are entitled to have a jury pass upon the case. *Candelier*, 129 A.D.2d at 146, 517 N.Y.S.2d 486. Accordingly, this Court finds that defendant's motion for summary judgment on this issue should be denied.

### II. Plaintiffs' Motion for Collateral Estoppel

Plaintiffs move to collaterally estop defendant SDK from denying at trial that its LT caused EMS and that its LT was defective. (Memorandum of Law in Support of Plaintiffs' Motion To Collaterally Estop Defendant Showa Denko K.K. from Denying at Trial that its L–Tryptophan Caused Eosinophilia Myalgia Syndrome and was Defective, *Kramer v. Showa Denko K.K.*, 91 Civ. 0582 ("Plaintiffs' Motion") at 1 (May 1, 1996).) They contend that both of these issues previously were resolved finally and fairly against SDK in two other jury trials, and that this Court should grant preclusive effect in the instant case to the findings made by the juries in each of the previous two cases. *Id.* at 1–3.

Plaintiffs both cite and submit to this Court documentation of the only other LT-

litigations in this country that have gone to trial. *Id.* at 2–3 & Exs. 3–7. In *DiRosa v. Showa Denko K.K.,* a 42 year-old school teacher claimed that she developed EMS after ingesting LT manufactured by SDK. *Id.* at 2. Plaintiff DiRosa alleged three separate theories of liability in her case: (1) that SDK's LT was defective as manufactured; (2) that SDK failed to warn of the dangers associated with using LT; and (3) that SDK was negligent. *Id.* A California state-court jury found in favor of plaintiff and awarded her $1.8 million in compensatory damages. The judgement was affirmed on appeal. *DiRosa v. Showa Denko K.K.,* 44 Cal.App.4th 799, 52 Cal.Rptr.2d 128 (1996).

Although the court in *DiRosa* explicitly charged the jury with all three theories of liability, the jury verdict form failed to ask the jury to specify upon which grounds its judgment was rendered. (Plaintiffs' Motion at 10.) According to plaintiffs in the instant case, however, "the verdict returned in DiRosa necessarily demonstrates that the jury found that SDK's [LT] caused Mrs. DiRosa to develop EMS. There can be no other logical interpretation of the award." *Id.*

The other case that plaintiffs cite, and the only other LT case to have been tried to a jury verdict, is *Creamer v. Showa Denko K.K..* In Georgia federal court, plaintiff Creamer claimed that SDK's LT caused her EMS, and that the LT was defective when sold. *Id.* at 3. The jury in this case was instructed on, and found for plaintiff, "on one theory, which theory is the same as New York's implied warranty of merchantability." *Id.* at 13. It returned a verdict in favor of plaintiff in the amount of $3,307,358, and awarded her husband $400,000 for loss of consortium. *Id.* at Ex. 5.

Plaintiffs maintain that in each of these two cases, defendant SDK appeared and had a full and fair opportunity to litigate two issues which are identical to issues involved in the instant case—whether SDK's LT caused EMS and whether SDK's LT was defective. *Id.* at 7–9. Plaintiffs further represent that the jury verdicts in each case necessarily and actually decided each of these issues. *Id.* at 9–13. Moreover, plaintiffs contend that applying offensive collater-

al estoppel in the instant case would be both fair and in the interests of judicial economy. (Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion To Collaterally Estop Defendant Showa Denko K.K. from Denying at Trial That Its [LT] Caused [EMS] and Was Defective, *Kramer v. Showa Denko, K.K.,* 91 Civ. 0582, at 2, 6–7 (June 5, 1996).)

Defendant contests plaintiffs' motion for collateral estoppel on two grounds. First, defendant claims that plaintiffs have not satisfied the prerequisites for invoking collateral estoppel. (Showa Denko K.K.'s Opposition to Plaintiffs' Motion To Collaterally Estop SDK from Denying (1) that its L–Tryptophan Caused Plaintiff Noel Kramer's Alleged EMS, and (2) that the L–Tryptophan Allegedly Ingested by Plaintiff Noel Kramer Was Defective, *Kramer v. Showa Denko K.K.,* 91 Civ. 0582, at 1 (May 22, 1996).) Defendant represents that the *DiRosa* verdict is currently on appeal to the California State Supreme Court. *Id.* at 8–9. It then explains that "California law determines what preclusive effect the *DiRosa* jury verdict can have during the pendency of an appeal," and that under California law, a judgment is not final for purposes of collateral estoppel while it is still open to direct attack. *Id.* at 9. Accordingly, defendant claims that the *DiRosa* verdict cannot be used as a basis for the instant offensive collateral estoppel motion. *Id.* at 10.

Defendant also claims that each of the verdicts upon which plaintiffs rely does not meet the prerequisites for applying offensive collateral estoppel because each does not meet the doctrine's "identical issue" requirement. *Id.* at 13–18. Defendant explains that the jury in *DiRosa* decided only that DiRosa consumed some of SDK's LT, and that the specific lot of SDK LT that DiRosa consumed caused her injuries. *Id.* at 16. According to defendant, the *DiRosa* jury made no findings regarding: (1) the general propensity of SDK LT to cause any specific malady; (2) whether any SDK LT other than that consumed by DiRosa was defective; or (3) the specific LT ingested by Noel Kramer. *Id.* Consequently, SDK maintains that the issues that the *DiRosa* jury decided are not

identical to those present in the instant case, and that *DiRosa* should not be given preclusive effect in the instant litigation. *Id.*

Defendant advances a similar argument regarding the *Creamer* verdict. According to defendant, during the period from 1982 to 1989, SDK manufactured five different strains of LT, using numerous, different manufacturing processes. *Id.* at 4–5. AS SDK explains, "strain three for example, was used from February 1986 through November 1988, whereas strain five was used from December 1988 through November 1989," and thus "a lot produced from strain three could not—by definition—have been produced under identical operating conditions as a lot produced from strain five." *Id.* at 5.

SDK claims that Noel Kramer and the *Creamer* plaintiff ingested LT from different lots. The LT consumed by the Creamer plaintiff came from lot five. *Id.* at 13 Accordingly, the *Creamer* jury "was asked to determine whether particular lots of strain five LT ingested by that plaintiff contained a legally-actionable 'defect'...." *Id.* Noel Kramer, on the other hand, has produced no evidence that the LT he ingested came from this same lot. In fact, "the only evidence Mr. Kramer has adduced in this case shows that he ingested ... LT manufactured from an SDK raw material lot produced *before strain five production.*" *Id.* at 12 (emphasis in original). Because there is no evidence that Noel Kramer and the *Creamer* plaintiff ingested the same strains of SDK LT, there is no identity of issues, and, thus, plaintiffs' motion should be denied. *Id.* at 13.

Second, defendant asserts that "applying nonmutual, offensive collateral estoppel would be fundamentally unfair to SDK." *Id.* at 1–2. SDK argues that district courts have discretion to refuse to apply offensive collateral estoppel in cases where it would be unfair to the defendants. *Id.* at 18. SDK claims that "such unfairness would plainly result here, where the cause of plaintiff's alleged injuries remains unknown and where scientific research in the area continues to evolve." *Id.* Defendant further argues that applying offensive collateral estoppel in this case "would confuse the jury and prejudice the defendant." *Id.* at 19.

The doctrine of collateral estoppel prevents previously litigated issues from being relitigated. *Beck v. Levering,* 947 F.2d 639, 642 (2d Cir.1991) (*per curiam*), *cert. denied sub. nom Levy v. Martin,* 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992); *In re Ivan Boesky Sec. Litig.,* 848 F.Supp. 1119, 1122 (S.D.N.Y.1994). The Supreme Court has explained that the doctrine "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).

Previously, "the use of collateral estoppel was limited by the requirement of 'mutuality,' whereby neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the prior judgment." *Boesky,* 848 F.Supp. at 1122–23; *see Parklane Hosiery,* 439 U.S. at 326, 99 S.Ct. at 649. Although this mutuality requirement was abolished, courts distinguished between the defensive and offensive use of collateral estoppel. Defensive collateral estoppel prevents a plaintiff who has lost in a prior action from relitigating issues merely by naming a new adversary. Offensive collateral estoppel permits a plaintiff who was not a party to a prior action to estop a defendant from relitigating issues that the defendant previously litigated and lost in a prior action. Although offensive collateral estoppel had been criticized for "potentially being unfair to a defendant who could be forever bound by a judgment against him, even if he could not foresee future suits and thus had little incentive to litigate vigorously," *Boesky,* 848 F.Supp. at 1123, the Supreme Court endorsed its use in *Parklane Hosiery Co. v. Shore,* 439 U.S. at 331, 99 S.Ct. at 651–52; *see Boesky,* 848 F.Supp. at 1123.

District courts may, in their discretion, grant offensive collateral estoppel where two requirements are met: (1) the issue for which preclusion is sought is identical to one that was actually and necessarily decided in the prior proceeding; and (2) the

non-movant had a full and fair opportunity to litigate that issue in the prior proceeding. *Parklane Hosiery*, 439 U.S. at 331, 99 S.Ct. at 651–52; *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir.1994); *Ward v. Harte*, 794 F.Supp. 109, 112 (S.D.N.Y.1992). Courts prohibit the use of collateral estoppel, however, if the issues in the two proceedings are not truly identical. *Lindsay v. Ortho Pharm. Corp.*, 637 F.2d 87, 92 n. 2 (2d Cir. 1980). In addition, courts ·bar the use of offensive collateral estoppel where there is any ambiguity regarding which issues actually were decided in the prior proceeding. *Chew v. Gates*, 27 F.3d 1432, 1438 (9th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995); *see Khandhar v. Elfenbein*, 943 F.2d 244, 248 (2d Cir. 1991).

 Reviewing the parties' respective arguments in light of these standards, this Court exercises its discretion to deny plaintiffs' motion. First, defendant is correct in its assertion that the *DiRosa* verdict is not entitled to preclusive effect. The federal Full Faith and Credit Statute, 28 U.S.C. § 1738, requires federal courts to grant state court judgments "the same full faith and credit in every court . . . as they have by law or usage in the courts of such State . . . from which they are taken." *See also, Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985). The *DiRosa* case was filed and tried in California state court, and, thus, California law determines what preclusive effect the *DiRosa* verdict has during the pendency of its appeal. *See Khandhar*, 943 F.2d at 247. "California law is settled that pending appeal a trial court judgment is not final" for issue-preclusion purposes. *Sandoval v. Superior Court*, 140 Cal.App.3d 932, 936, 190 Cal.Rptr. 29 (Cal.Ct. App.1983). It is undisputed that the *DiRosa* case is currently pending appeal before the California Supreme Court. Accordingly, this Court finds that *DiRosa* is not a final judgment.

 Second, this Court finds that neither the *DiRosa* nor the *Creamer* juries necessarily decided identical issues to those currently pending before this Court. Defendant's ex-

planation of its LT manufacturing processes demonstrates that all SDK LT was not manufactured in a standard, uniform fashion. Absent such a uniform manufacturing process, it is impossible to find that all SDK LT is of the same quality or subject to the same alleged manufacturing defects. Moreover, the only evidence that the parties have produced regarding the LT that Noel Kramer ingested establishes that it did not come from the same lot as the LT consumed by the *Creamer* plaintiff. Given that the SDK LT taken by the plaintiffs in these two cases came from different lots, which were manufactured under different conditions, the facts and arguments considered by the *Creamer* jury are not identical to the facts and arguments present in the instant case. Case law is clear that collateral estoppel is inapplicable in cases where there is any ambiguity regarding which issues actually were decided in the prior proceeding. *Chew*, 27 F.3d at 1438; *see Khandhar*, 943 F.2d at 248. Accordingly, this Court finds that *Creamer* should not be given preclusive effect.

 The *DiRosa* verdict is similarly inapposite. As plaintiffs explained, the form given to the jurors in *DiRosa* did not require the jurors to specify upon which grounds they rendered their judgment. Without such specification, it is impossible to be sure exactly which issues the jurors "necessarily decided." Moreover, as in *Creamer*, it is not clear that DiRosa and Noel Kramer ingested SDK LT manufactured at the same time, in the same lot, and under the same manufacturing conditions. Consequently, this Court finds that collateral estoppel effect should not be granted to the *DiRosa* verdict.

 Finally, this Court finds that it would be unfair to apply offensive, non-mutual collateral estoppel based on either the *DiRosa* or the *Creamer* verdicts. The Supreme Court has cautioned that "where the application of offensive collateral estoppel would be unfair to a defendant, a trial judge should not allow the use of collateral estoppel." *Parklane Hosiery*, 439 U.S. at 331, 99 S.Ct. at 652. This Court is cognizant that a single products liability case typically involves individualized circumstances peculiar to that case alone, such as the age and health

of the plaintiff, the conditions under which the product was used, or the precise circumstances surrounding plaintiff's injury. Such factual idiosyncracies necessarily prevent a single finding from one such case to be applied to all other cases in cookie-cutter fashion. To find otherwise could distort a jury's decision on the remaining, open questions, prejudice a defendant's ability to litigate case-specific issues, and insulate a plaintiff from the burden of having to prove his case. This Court finds that applying offensive collateral estoppel in the instant case would subject the *Kramer* litigation to these very evils. Accordingly, this Court finds that it would be unfair to grant plaintiffs' preclusive motion in this case, and that this motion should be denied.

### CONCLUSION

IT IS HEREBY ORDERED THAT defendant's motions for summary judgment on the issues of punitive damages and negligence are DENIED

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on the issue of "actionable misrepresentations" is GRANTED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on the issue of lost-income damages for Noel Kramer's future income from Eclipse stock is GRANTED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on the issue of lost-income damages for Noel Kramer's lost future earnings as an investment advisor is GRANTED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on the issue of lost-income damages for Noel Kramer's lost salary as an employee of Eclipse and for Noel Kramer's lost use of a car is DENIED.

IT IS FURTHER ORDERED THAT plaintiffs' motion for collateral estoppel is DENIED.

SO ORDERED.